ALLEGHENY ENERGY SUPPLY COMPANY, successor to West Penn Power, Potomac Edison Company, and Monongahela Power Company, Appellants,

v.

COUNTY OF GREENE, Monongahela Township, Southeastern Greene School District.

Allegheny Energy Supply Company, successor to West Penn Power, Potomac Edison Company, and Monongahela Power Company,

v.

County of Greene, Monongahela Township and Southeastern Greene School District,

Appeal of Southeastern Greene School District,

Allegheny Energy Supply Company, LLC, Potomac Edison Co. and Monongahela Power Co.,

v.

County of Greene, Board of Assessment Appeals, Appellant.

Commonwealth Court of Pennsylvania.

Argued Oct. 9, 2001.

Decided Dec. 10, 2001.

As Amended Dec. 14, 2001.

---

Carleton O. Strouss, Harrisburg, for appellants.

Anthony Giglio, Pittsburgh, for appellees.

Before COLINS, Judge, FRIEDMAN, Judge, McCLOSKEY, Senior Judge.

COLINS, Judge.

Allegheny Energy Supply Company, Potomac Edison Company, and Monongahela Power Company (Taxpayers) appeal the order of the Court of Common Pleas of the 13th Judicial District, Greene County sustaining their tax appeal and setting the market value of the taxable realty for the 2000 tax year. Among the issues raised by the Taxpayers is a challenge to the trial court's valuation of electric generation facilities subsequent to the 1999 amendments to the law commonly known as the Public Utility Realty Tax Act (PURTA).[1] Greene County School District and Greene County Board of Assessment Appeals (Board) filed separate cross-appeals.

The Taxpayers own two tax parcels located in Monongahela Township, Greene County, and in the Southeastern Greene School District: the 144–acre Hatfield Ferry Power Station on the west bank of the Monongahela River, and a nearby, 166–acre landfill used for ash disposal. In July 1999, the School District sought an increase in the parcels' assessed values for the 2000 tax year[2] based on the 1992 countywide reassessment, which set the fair market value of the parcels at approximately $3 million. By decision dated March 30, 2000, the Board increased the total assessed value of the land and improvements.[3]

The Taxpayers appealed to the trial court, which viewed the parcels and the electric generation process and took evidence. The Taxpayers, the School District, and the Board each presented expert testimony on the value of the parcels. In accordance with the applicable law, the trial court considered the cost, comparable sales, and income methods of determining the actual value of the real estate and improvements and decided that the cost method would be the soundest in this case. Citing *Reichard–Coulston v. Revenue Board of Northampton County*, 102 Pa. Cmwlth. 227, 517 A.2d 1372 (1986), *petition for allowance of appeal denied*, 517 Pa. 611, 536 A.2d 1335 (1987), the court evaluated the land's highest and best use, the value of the vacant land, and the value of the taxable improvements for each parcel.

After considering the varying opinions of the experts, the court concluded that the highest and best use of the Hatfield Ferry Power Plant site is to continue the present use as a power plant. The School District's expert set the value of the site, as vacant land, at $26 million based on a comparison with three other power plants. The Board's expert admitted having no knowledge of the value of industrial property in Greene County and opined that the minimum price for the land would be approximately $52.8 million. Based on his opinion that the land is suitable only for general industrial use and considering the

---

1. Act of July 4, 1979, P.L. 60, *as amended*, 72 P.S. §§ 8101–A–8110–A.

2. Effective January 1, 2000, electric generation facilities were no longer subject to PURTA and therefore began to be taxed locally. Because under PURTA taxation was not based on assessed value, in 2000, local taxing authorities and electric generators began to file assessment appeals challenging the assessed value of such facilities.

3. For the power station, the Board increased the assessed value from $825,060 to $20,850,000; for the landfill the assessed valued increased from $35,100 to $150,000.

low demand for such land in Greene County, the Taxpayers' expert set the value at $172,800, based on a price of $1,200 per acre. The trial court adopted the Taxpayers' valuation of the vacant land.

Next the court considered the value of the taxable improvements. For the Hatfield Ferry Power Station site, the trial court accepted as most credible the estimate of the Taxpayers' expert, who inventoried and measured the buildings and calculated the replacement cost using a standard construction guide. The court adopted the expert's replacement cost for the site's buildings and silos, less 33 percent depreciation for a value of approximately $13.2 million. The court rejected the expert's adjustment of that figure by 35 percent for obsolescence. The court rejected the School District's expert's estimate of approximately $57 million as the reproduction cost of the improvements (based on figures the Taxpayers submitted to the Federal Energy Regulatory Commission for its structures and improvements), and the Board's expert's estimate of approximately $29.6 million replacement value of building structures based on $150 and $200 per square foot for office buildings and industrial buildings, respectively.

Although the court accepted the Taxpayers' method of valuation, it concluded that the Taxpayers' expert erroneously omitted from his inventory the power plant's smokestacks, cooling towers, docking facilities, coal distribution columns, and water intake structure. The court concluded that the smokestacks and cooling towers are included in PURTA's definition of utility realty and therefore are not exempt machinery and equipment. It accepted the Board expert's replacement cost valuation of the smokestacks, docking facilities, coal distribution columns and water intake structure, less depreciation, because it was the only estimate offered. The court applied no value to the cooling towers because no estimate of their value had been offered by any expert.

■ As for the landfill site, the court accepted the School District expert's estimate of actual value in favor of the Taxpayer's estimate using the cost approach. The Board offered no estimated value for the landfill. For the tax year 2001,[4] the court adopted the Taxpayers' valuation of the power plant site based on the tax year 2000 figures, adding the value of a one-story building constructed during 2000, less depreciation. The court carried forward the 2000 valuation of the land fill and the 2000 valuation of the power plant site's smokestacks, docking pillars, and water intake structure.

On appeal to Commonwealth Court the Taxpayers argue as follows: 1) the trial court erroneously concluded that the smokestacks, cooling towers, and water intake structure are taxable based on PURTA's definition of utility realty; 2) the applicable assessment law for determining fair market value using the cost approach requires an adjustment for depreciation and obsolescence; and 3) the trial court erred when it admitted an expert report authored by Jeffrey Kern because the evidence was not the product of his own work or the application of his judgment, and when it accepted the testimony of the Board's expert, Arthur Holland, because he lacked the requisite knowledge, skill, experience, training, or education to qualify him as an expert on the value of real estate.

---

4. Assessments for tax years arising during the pendency of an assessment appeal before the court of common pleas are automatically appealed. *RAS Development Corporation v. Fayette County Board of Assessment Appeals,* 704 A.2d 1130 (Pa.Cmwlth.1997).

On cross-appeal, the School District argues that the trial court abused its discretion when it adopted the Taxpayers' general industrial land valuation despite having determined that the land's highest and best use is as a power plant. It finds error in the trial judge's finding that the School District's estimate reflected value-in-use rather than value-in-exchange. With respect to the valuation of the improvements, the School District argues that the trial court abused its discretion when it rejected the School District's valuation based on the improvements' actual costs as set forth in the FERC Form 1[5] and when it adopted the Taxpayers' valuation based on the replacement cost of general industrial improvements rather than power plant improvements. In its cross-appeal, the Board of Assessment Appeals argues that all of the expert evidence supports the application of a 100 percent premium to the value of the smokestacks, docking facilities, and water intake structure. It disputes the trial court's statement that its expert offered no evidence to support his opinion that these assets should be valued at a premium over their replacement costs.

■ Under the Section 602(a) of The Fourth to Eighth Class County Assessment Law (Law),[6] all subjects and objects of local taxation must be assessed according to their actual value. 72 P.S. § 5453.602(a). The Law mandates that actual value be determined by considering three methods of valuation: the cost (reproduction or replacement value less depreciation and obsolescence), comparable sales, and income approaches. 72 P.S. § 5453.602(a). In tax assessment appeals, actual value or fair market value is determined by competent witnesses testifying as to the property's worth in the market; i.e., the price a willing buyer would pay a willing seller, considering the uses to which the property is adapted and might reasonably be adapted. *F & M Schaeffer Brewing Company v. Lehigh County*, 530 Pa. 451, 610 A.2d 1 (1992) (quoting *Buhl Foundation v. Board of Property Assessment*, 407 Pa. 567, 570, 180 A.2d 900, 902 (1962)).

■ The trial court's duty in an assessment appeal is to weigh the conflicting expert testimony and determine a value based upon credibility determinations. *Air Products v. Board of Assessment*, 720 A.2d 790 (Pa.Cmwlth.1998). The trial court has the discretion to decide which of the methods of valuation is the most appropriate and applicable to the given property. *Id.; RAS Development Corporation v. Fayette County Board of Assessment Appeals*, 704 A.2d 1130 (Pa.Cmwlth.1997).

The School District argues that the trial court erred or abused its discretion when it concluded that the land's highest and best use is as a power plant and then adopted the value propounded by the Taxpayers' expert based on general industrial use. According to the School District, the cost approach requires that the valuation of the vacant land be stated in terms of its highest and best use, and that the trial court ignored the principles stated in *McGraw–Edison v. Washington County*, 132 Pa.Cmwlth. 437, 573 A.2d 248 (1990), that permit a valuation based on the continuation of the property's present use.

■ The cost approach to valuation as employed by the trial court uses the following formula: 1) the estimated value of

---

**5.** The valuation was based on the value the power plant's owners submitted to the Federal Energy Regulatory Commission for Structures and Improvements account 311.

**6.** Act of May 21, 1943, P.L. 571, *as amended.*

the land, which is assumed to be vacant and available for its highest and best use, added to 2) the estimated reproduction cost for the facility, less depreciation. *Reichard–Coulson.* Contrary to the School District's contentions, the cost approach does not require that the valuation of either the vacant land or the improvements be stated in terms of its highest and best use. "[A] property's use and its resulting value-in-use cannot be considered in assessing the fair market value of property for tax assessment purposes in Pennsylvania." *F & M Schaeffer*, 530 Pa. at 457–58, 610 A.2d at 4. "[V]alue-in-use is based on the *use* of the property *and the value of that use to the current user,* ....and it is not relevant in tax assessment cases...." *Id.* (emphasis added).

The trial court did not ignore the principles stated in *McGraw–Edison*, in which we upheld the use of a market data/comparable sales approach to determine the value of a manufacturing facility. Although the credited expert testified that he used a "continued use" approach to valuation, which he described as based on the assumption that the property would continue to be used by "a single manufacturer ... in either the same or a similar capacity as McGraw Edison." 573 A.2d at 251. *McGraw–Edison* does not stand for the proposition that a valuation must be stated in terms of its highest and best use. Furthermore, the assumption that a manufacturing facility will continue to be used for manufacturing or warehousing is tantamount to assuming the continuation of a general industrial use. In this case, the School District and the Board reject a valuation based on a general industrial use in favor of one based on the current industrial use as a power plant.

### Valuation of the Vacant Land

 Applying those principles, the trial court, in arriving at a value for the vacant land in this case, adopted the Taxpayers' valuation based on the value of land devoted to general industrial purposes. The trial court properly rejected the School District's valuation of the vacant land because it was based on the property's use as a power plant. The School District's expert based his valuation on a comparison with three other power plants and arrived at a value expressed in terms of a dollar value per kW of capacity.[7] The trial court rejected the valuation because it valued the land based on its ability to support a certain generating capacity and because the valuation was based on the land's use as a power plant. Although the trial court concluded that the land's highest and best use was the continuation of its use as a power plant, we find no inconsistency in the court's valuation of the *vacant* land with no consideration given to the current use. The highest and best use to which land is adaptable is but one factor in determining fair market value, and the concept includes consideration of the property's reasonably foreseeable prospects.[8] *Air Products.*

### Valuation of the Improvements

 First we address the School District's argument that the trial court abused its discretion when it adopted the Taxpayers' valuation instead of the School Dis-

---

7.  He compared 1) the sale price ($52.2 per kW) for an Oregon site having the necessary permits for construction of a generation plant; 2) the sale price of an existing Pennsylvania power plant, discounting the value of the site improvements; and 3) the sale price of a New York power plant in which the buyer agreed to pay a premium to convert the plant to increase its capacity.

8.  This case is in no way similar to *Air Products,* in which we rejected a valuation based on speculation as to what the subject property would be worth in an altered condition.

trict's valuation. Its own valuation, it explains, was based on the replacement cost of power plant improvements, in contrast to the Taxpayers' valuation, which the School District characterizes as based on a general industrial use. The School District further argues that the court lacked a valid basis for rejecting its valuation based on the FERC Form 1 account pertaining to structures and improvements.

Our reading of the trial court's opinion reveals several bases on which the court rejected the School District's valuation in favor of the Taxpayers'. In discussing the School District expert's method of valuation, the court expressed concerns 1) that the FERC form reported costs no matter when they were incurred, such that a structure's cost would include both its original cost and the cost of improvements (such as a new roof), thereby accumulating value, and that the cost of razed structures would still be represented; and 2) that the FERC form's category for structures and improvements, which might include machinery and equipment, has no correlation to the item's taxability under Pennsylvania law. (Opinion, p. 17.) In finding the Taxpayers' expert to be more credible, the court expressed a preference for that expert's methodology, in which he inventoried and measured every structure and evaluated it in terms of its taxability. (Opinion, pp. 18–19.) Even if we accept the School District's contention that the court mischaracterized the FERC values,

the trial court's other concerns and its preference for the accuracy and specificity of the Taxpayers' expert support the court's adoption of the Taxpayers' methodology in favor of the School District's.

We also reject the School District's contention that the trial court erred or abused its discretion in adopting the Taxpayers' valuation because the Taxpayers' expert based his valuation on a general industrial use rather than a power plant use. Although the trial court did determine that the property's highest and best use is as a power plant,[9] that determination in no way precluded the court from adopting the Taxpayers' estimate of the replacement cost of the facility. We repeat, the value of the property for a specific use and the value of that use to the current owner are not relevant in determining fair market value. *F & M Schaeffer.* Furthermore, the Taxpayers' expert clearly considered the power plant and general industrial uses to be interchangeable.[10] To the extent that the trial court concluded otherwise, it was mistaken.

■■■ The Taxpayers' argue that the court erred when it disallowed a cost reduction for obsolescence because depreciation comprises obsolescence, which exists regardless of the property's highest and best use. Furthermore, they argue, Section 602(a) of the Law requires a reduction

9. The court stated, "There is simply no basis to believe that if the power plant was to be sold, it would be sold for anything other than a power plant." (Opinion, p. 7.)

10. When asked about his analysis of the improved property's highest and best use, he testified as follows:
   [T]he site has been used as power plant location for approximately 33 years. . . . So you have over 30 years of operation continuously as an industrial site. The most probable use of the site will be for continua-

tion of this existing operation. The plant is in good condition, the machinery and equipment all seems [sic] to be in operation and there is an economic demand for the product that is being manufactured here. So that my assumption is that if I come back 10 or 15 years from now there will still be a power plant here . . . . The probable use would be a continuation of an industrial use.
(Notes of Testimony, pp. 96–97.)

for obsolescence when using the cost method of valuation.[11] We agree.

Section 602(a)'s statement of the cost approach to valuation includes a reduction in value for obsolescence, and the trial court mistakenly disallowed the reduction. The Taxpayers' expert defined obsolescence, functional and economic, in terms of efficiency and economic demand. In calculating obsolescence, he considered the number of buildings, because of their locations on the site, their lack of heating or electricity, and the fact that many of them are ideally suited to the needs of the power plant and otherwise have little economic value. Certainly, the value of the improvements should be reduced to reflect functional obsolescence, in terms of the loss in value cause by overcapacity and inadequacy, and to reflect economic obsolescence, the loss in value attributable to the lack of economic demand.

### Taxability of the Smokestacks, Cooling Towers, and Water Intake Structure

Prior to January 1, 2000, all public utilities paid to the Department of Revenue a utility realty tax based on "the State taxable value of utility realty" at the statutory millage rate. Section 1102–A(a) of PURTA, 72 P.S. § 8102–A(a). The Department of Revenue then distributed a portion of the revenue collected to local taxing authorities based on reported local assessment values and rates. Section 1106–A of PURTA, 72 P.S. § 8106–A. After the deregulation of electric generation in 1996, the General Assembly in 1999 amended PURTA such that all electric generators, both utility and non-utility, are taxed locally. The PURTA tax is applied to "utility realty," and after the amendments, utility realty no longer includes land and improvements that are used in the generation of electricity. Utility realty as defined by PURTA includes smokestacks, cooling towers, and water intake structure; it does not include machinery and equipment.

"Utility realty." All lands together with all buildings, towers, *smokestacks*, dams, dikes, canals, *cooling towers*, storage tanks, reactor structures, pump houses, supporting foundations, enclosing structures, containment structures, reactor containment outer shells, reactor containment vessels, turbine buildings, recovery tanks, solid waste area enclosures, primary auxiliary buildings, containment auxiliary safeguard structures, fuel buildings, decontamination buildings, and all other structures and enclosures whatsoever which are physically affixed to the land ... without regard to the classification thereof for local real estate taxation purposes, but *not including machinery and equipment,* whether or not housed within such building, structure or enclosure, *or, after December 31, 1999, land and improvements to land that are indispensable to the generation of electricity,* located within this Commonwealth that at the end of the taxable year are owned by a public utility or its affiliate either directly or by or through a subsidiary and are used ... in the furnishing, including producing, storing, distributing or transporting, of public utility service and which are not subject to local real estate taxation....

Section 1101–A(3) of PURTA, 72 P.S. § 8101–A(3) (emphasis added).

■ Electric generation facilities, even those owned by regulated utilities, are now taxed locally and not under PURTA.

---

**11.** In pertinent part, Section 602(a) states, "In arriving at the actual value, all three method: namely, cost (reproduction or replacement, as applicable, less depreciation and all forms of obsolescence), comparable sales and income approaches must be considered in conjunction with one another." 72 P.S. § 5453.602(a).

The trial court recognized that generation facilities are taxed locally and that machinery and equipment are excluded from taxation under local taxation and under PURTA; therefore, the court erred when it determined that the smokestacks, cooling towers, and water intake structure were taxable because of their inclusion in the PURTA definition of utility realty.

The smokestacks, cooling towers, and water intake structures are taxable under The Fourth to Eighth Class County Assessment Law if they are taxable at all. Section 201 of the Law provides in pertinent part,

> The following subjects and property shall as hereinafter provided be valued and assessed and subject to taxation for all county, borough, town, township, school (except in cities), poor and county institution district purposes, at the annual rate,
>
> (a) All real estate, to wit:.... Machinery, tools, appliances and other equipment contained in any mill, mine, manufactory or industrial establishment shall not be considered or included as a part of the real estate in determining the value of such mill, mine, manufactory or industrial establishment.

72 P.S. § 5453.201. In order for the smokestacks, cooling towers, and water intake structure to be excluded from real estate tax assessment and valuation, they must constitute industrial machinery and equipment used directly in the manufacturing process as necessary and integral parts of the process used solely in effectuating its purpose. *Jones & Laughlin Tax Assess-*

*ment Case,* 405 Pa. 421, 175 A.2d 856 (1962).

■ Although the record contains some testimony to the effect that power plants operate on the basis of a thermal cycle,[12] it is not clear from that testimony whether, and if so, how the smokestacks, cooling towers, and water intake structure are involved in that process. Logic would seem to dictate that the smokestacks, cooling towers, and water intake structure are used directly in the manufacturing process by their inclusion in the thermal process;[13] however, legal decisions must be based on evidence of record, and in this case, the record does not include sufficient facts on which to base such a determination. The parties will be best served by a remand for the taking of evidence and a determination as to whether these improvements are excluded from taxation under Section 201 of the Law.

**Admissibility of the Board's Evidence**

■ Finally the Taxpayers challenge the admissibility of the testimony of the Board's experts, Arthur Holland and Jeffrey Kern, and their composite report. Specifically, they direct our attention to Mr. Kern's acknowledgment that he performed no independent calculations of value and failed to perform valuations under the three statutory approaches, and that his report included no conclusions of his own. They argue that Kern's report is a wholesale adoption of data compiled by PACE Global Energy Services, and that Mr. Holland, an account manager for PACE, failed to demonstrate the knowledge, skill, experience, training, or edu-

---

**12.** In the thermal cycle, fuel is burned to produce heat to turn water into the steam, which passes through a turbine that activates a generator, producing electric power that is transmitted to the transmission grid. (Notes of Testimony, p. 490.)

**13.** *See Jones & Laughlin,* in which quinching towers for the coke ovens, as a necessary part of the process of making coke, were found to be machinery, but loading docks, which benefit the land generally, were not within the definition of equipment and machinery.

cation that would qualify him to testify as an expert on real estate valuation.

Mr. Holland testified that PACE is an energy consulting and energy management firm that supports the financing of power projects and as such determines their economic viability and value. (Notes of Testimony, pp. 467–68.) Mr. Holland has a Master's Degree in Business Administration. Counsel for the Taxpayers objected to Mr. Holland's qualification as an expert in real estate appraisal. Acknowledging Mr. Holland's lack of expertise in the Greene County real estate market, the trial judge qualified Mr. Holland as an expert in electric market analysis. (Notes of Testimony, p. 476.)

Mr. Kern, a certified real estate appraiser and president of Resource Technologies Corporation, hired PACE and used data generated by PACE in its own report. The trial judge overruled the Taxpayers' objections to Mr. Kern's testimony, including the objection that Mr. Kern failed to conduct an independent analysis of the data, and the objection to admission of the report. Mr. Kern acknowledged that the valuation to which he testified was calculated by PACE.

▇▇ The judge acknowledged Mr. Holland's expertise in analysis of the market for electric generation; i.e., determining a power plant's economic viability and value. Although the Law does not require that evidence of a property's value be given by a certified real estate appraiser, Mr. Holland testified that PACE's valuation was assembled by a team of energy experts with expertise in consultation with vendors to determine replacement cost. The trial court did not err in admitting his testimony and the PACE report on which it was

based; however, the judge ruled that Holland's testimony inadmissible on the value of the site improvements.

> To make it clear, okay, if I am being asked to rule on the admissibility of the figures ... on the replacement values of the smokestack, switch yard, boiler house, ... and the water intake structure and the basis of those figures is that somebody told Mr. Holland that that is what those figures, that is what those items would cost to replace, that is how much it would cost to replace those items, then that is hearsay and that is inadmissible.

(Notes of Testimony, pp. 499–500.) Based on this ruling, the court erred when it adopted Mr. Holland's valuation of the smokestacks, cooling towers, and water intake structure.[14] Because Mr. Holland's valuation of the improvements was ruled inadmissible, we reject the Board's argument, based on that valuation, that a premium should be applied to the value of some of the improvements. The credited testimony of the Taxpayers' expert does not support such a conclusion.

▇▇ Mr. Kern, an expert in real estate valuation, adopted the PACE valuation in its entirety, and the trial court ruled Mr. Kern's testimony to be duplicative of Mr. Holland's testimony. Mr. Kern, who was qualified as a certified real estate appraiser, based his opinion solely on the PACE valuation. Although the PACE report arguably constitutes facts or data upon which real appraisers reasonably rely in forming their valuations,[15] the Resources Technologies report contains no independent valuation based on the PACE analysis, and Mr. Kern offered no valua-

---

14. The court discredited Mr. Holland's testimony and valuation of the vacant land and the buildings and structures. (Opinion, pp. 14–15, 18.)

15. Pa. R.E. 703.

tion other than that contained in the PACE report and Mr. Holland's testimony. Mr. Kern's testimony is inadmissible because an expert may not repeat another's opinion or data without exercising his own expertise or judgment.[16]

Accordingly, the order of the trial court is affirmed in part and reversed in part. We reverse the judge's disallowance of a reduction in the value of the improvements for obsolescence, and his determination that the smokestacks, cooling towers, and water intake structure were taxable under PURTA. We remand for the taking of evidence on whether the smokestacks, cooling towers, and water intake structure are excluded from taxation under Section 201 of the Law, 72 P.S. § 5453.201, and if not excluded, for a determination of their value.

### ORDER

AND NOW, this 10th day of December 2001, the order of the Court of Common Pleas of the 13th Judicial District, Greene County is affirmed in part and reversed in part. We reverse the court's disallowance of a reduction in the value of the improvements for obsolescence, and its determination that the smokestacks, cooling towers, and water intake structure were taxable under PURTA. This matter is remanded for the taking of evidence on whether the smokestacks, cooling towers, and water intake structure are excluded from taxation under Section 201 of the Law, 72 P.S. § 5453.201, and if not excluded, for a determination of their value.

Jurisdiction is relinquished.

---

**16.** *Duquesne Light Company v. Woodland Hills School District,* 700 A.2d 1038 (Pa. Cmwlth.1997), *petition for allowance of appeal denied,* 555 Pa. 722, 724 A.2d 936 (1998).