## IN RE PP&L, INC.

Appeal from the Luzerne County Board of Assessment Appeals Tax Parcel No. 04–001–000, 04–001–000–001, 04–001–000–002.

Salem Township Assessment for the Tax Years 1998, 1999 & 2000.

Appeal of City of Philadelphia, School District of Philadelphia, and Southeastern Pennsylvania Transportation Authority.

### In re PP&L, Inc.

Appeal from the Luzerne County Board of Assessment Appeals Tax Parcel No. 04–001–000, 04–001–000–001, 04–001–000–002.

Salem Township Assessment for the Tax Years 1998, 1999 & 2000.

Appeal of PPL Electric Utilities Corporation, f/k/a PP & L, Inc. and PPL Susquehanna, LLC.

### In re PP&L, Inc.

Appeal from the Luzerne County Board of Assessment Appeals Tax Parcel No. 04–001–000, 04–001–000–001, 04–001–000–002.

Salem Township Assessment for the Tax Years 1998, 1999 & 2000.

Appeal of PPL Electric Utilities Corporation, f/k/a PP&L, Inc. and PPL Susquehanna, LLC.

Commonwealth Court of Pennsylvania.

Argued Sept. 9, 2003.
Decided Oct. 28, 2003.
Reargument En Banc Denied
Dec. 30, 2003.

Malcolm J. Gross, Allentown, and Michael Lesch, New York, for appellants, PP&L Electric Utilities Corp. and PP&L Susquehanna, LLC.

Joseph A. Dworetzky, Philadelphia, for appellees.

BEFORE: SMITH–RIBNER, Judge, and SIMPSON, Judge and FLAHERTY, Senior Judge.

OPINION BY Judge SIMPSON.

These consolidated appeals from orders of the Court of Common Pleas of Luzerne County (trial court) arise from an assess-

ment involving PP & L's [1] nuclear-powered electric generation facility in that county. The City of Philadelphia, the School District of Philadelphia, and the Southeastern Pennsylvania Transportation Authority (SEPTA) (collectively, Philadelphia Parties) appeal the assessment of utility realty under the recently amended Public Utility Realty Tax Act [2] (PURTA). PP & L seeks to quash the appeal of the Philadelphia Parties and to reverse the grant of intervenor status for the Philadelphia parties in a case involving Luzerne County property.

We decline to quash the appeal. Further, we affirm the grant of permissive intervention to the Philadelphia Parties. Finally, we affirm the trial court's assessment of utility realty.

As a part of industry deregulation,[3] Act 4 of May 12, 1999, P.L. 22, amended PURTA in two ways relevant to this litigation. First, effective January 1, 2000, electric generation facilities were no longer subject to PURTA and therefore began to be taxed locally. Second, the manner of evaluating PURTA realty was changed, retroactive to taxable years 1998 and 1999. Public utilities were given a one-time opportunity to file a retroactive appeal from the assessment of utility realty for the taxable years 1998 and 1999. *See Allegheny Energy Supply v. County of Greene*, 788 A.2d 1085 (Pa.Cmwlth.2001).

Procedurally, PP&L appealed from the assessment board to the trial court, and several local taxing authorities intervened. After about a year, the Philadelphia Par-

ties intervened. Shortly after trial began, PP&L settled its claims with the local taxing authorities. Non-jury trial proceeded with the Philadelphia Parties.

After considering extensive proposed findings, conclusions, and written argument, the trial court adopted PP & L's proposed findings and conclusions and adopted its proposed order, filed May 9, 2002 (First Order). Both parties filed post-trial motions. By letter apparently mailed May 28, the trial court set a briefing schedule for post-trial motions. Reproduced Record (R.R.) at 284a–85a. On June 6, before disposition of the post-trial motions, the Philadelphia Parties appealed the First Order.[4] Thereafter, the trial court received written argument and denied post-trial motions (Second Order). The Philadelphia Parties did not appeal from the Second Order disposing of their post-trial motions.

## I. Motion to Quash

■ Philadelphia Parties argue that because post-trial proceedings are prohibited in statutory appeals such as this, the First Order was the appropriate order from which to appeal. They rely on Pa. R.C.P. No. 227.1(g), which states: "A motion for post-trial relief may not be filed in an appeal from the final adjudication or determination of a local agency or a Commonwealth agency as to which jurisdiction is vested in the Courts of Common Pleas." Explanatory comment—1989 states: "New subdivision (g) prohibits post-trial proceed-

---

1. PPL Susquehanna LLC, successor to PPL Electric Utilities Corporation, d/b/a PPL Utilities, f/k/a PP & L, Inc., is the record title holder of the tax parcels in question.

2. Article XI–A of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended*, added by Section 3 of the Act of July 4, 1979, P.L. 60, *as amended*, 72 P.S. §§ 8101–A—8111–A.

3. *See* Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa.C.S. §§ 2801–2812.

4. PP & L subsequently filed a protective appeal from the First Order.

ings in a statutory appeal. The decision of the court in all such cases will be a final, appealable order."[5]

In contrast, PP&L argues that the trial court enjoyed inherent authority to accept and dispose of post-trial motions. When it does so, the appealable order is the order disposing of post-trial motions. Under this approach Philadelphia Parties' appeal from the First Order is improper, as it was taken from a non-final order. PP & L seeks to quash the appeal from the First Order.

PP&L relies on authority beginning with the leading case of *Appeal of Borough of Churchill*, 525 Pa. 80, 575 A.2d 550 (1990). In *Appeal of Borough of Churchill*, exceptions were filed to a trial court's order in an assessment appeal. Ultimately, the trial court disposed of the exceptions, and a further appeal was taken to this Court. In the absence of statutory authority or statewide procedural rule, this Court quashed the appeal taken from the order disposing of exceptions. The Supreme Court reversed, holding that even in the absence of rules governing statutory appeals, when the trial court accepts post-trial motions it may complete the process. The Supreme Court remanded to this Court for consideration of the appeals on the merits.

Despite the subsequent promulgation of the current version of Pa. R.C.P. No. 227.1, which explicitly prohibits post-trial practice in statutory appeals, this Court continues to permit post-trial practice in those cases where the trial court finds it helpful. The evolution of the position was

fully discussed in *Upset Price Tax Sale for Springfield Township*, 700 A.2d 607, 610 (Pa.Cmwlth.1997) in which this Court concluded (with emphasis added):

In each case where a trial court ruled upon the merits of post-trial motions and this Court quashed the appeal, the Supreme Court reversed and remanded. Accordingly, the Court expressly concludes from a close reading of *Appeal of Borough of Churchill, Shapiro*[*v. Center Twp., Butler County*, 159 Pa.Cmwlth 82, 632 A.2d 994 (1993)], and *In re Appeal of Sheetz, Inc.*[,657 A.2d 1011 (Pa. Cmwlth.1995)] that, absent some local rule prohibiting the filing of post-trial motions in a particular type of proceeding, *where a trial court has ruled upon the merits of post-trial motions, that ruling is the order from which an appeal may be taken.* Glen's appeal to this Court from the order of the trial court denying the post-trial motion therefore was timely.

The lessons from the *Borough of Churchill–Springfield Township* line of cases are several. All cases addressed appeals taken from the order disposing of post-trial motions, equivalent to the Second Order here. In all cases, post-trial practice was permitted where the trial court found it helpful.[6] Also, our Supreme Court demonstrated a pronounced preference for disposition of statutory appeals on the merits.

Considering the foregoing, we conclude that where the trial court accepts

---

5. *See* 1 *Pennsylvania Appellate Practice*, 2d Ed. (G. Ronald Darlington, Kevin J. McKeon, Daniel R. Schuckers, Kristen W. Brown) § 301:21 at 3–20 (2002) for a discussion of practice questions arising from the difficulties in harmonizing case law and procedural rules for post-trial practice in statutory appeals.

6. Our Supreme Court recently emphasized its preference for post-trial practice. *See Motorists Mutual Ins. Co. v. Pinkerton*, —— Pa. ——, 830 A.2d 958 (2003) (under Pa. R.C.P. No. 227.1, post-trial practice required in declaratory judgment actions); *Chalkey v. Roush*, 569 Pa. 462, 805 A.2d 491 (2002) (under Pa. R.C.P. No. 227.1, post-trial practice required after trial court decision at law or in equity).

and prepares to resolve post-trial motions, the ruling resolving post-trial motions is an order from which an appeal may be taken. Further, where the trial court accepts post-trial motions and schedules written argument on them, the initial order entered after trial is not the appealable order.

Although appeal from the First Order was improper once the trial court accepted post-trial motions and scheduled written argument, we need not quash the premature appeal. Pa. R.A.P. 905(a) provides in pertinent part:

A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof.

Thus, to promote judicial economy, Rule 905(a) creates a "legal fiction" allowing an appellate court to treat the premature notice of appeal as not premature but rather as filed on the date of the entry of the appealable order. 1 *Pennsylvania Appellate Practice*, 2d Ed. (G. Ronald Darlington, Kevin J. McKeon, Daniel R. Schuckers, Kristen W. Brown) § 905:3 at 9–46 (2002). We adopted this approach in *In re Conveyance of 1.2 Acres of Bangor Memorial Park*, 130 Pa.Cmwlth. 143, 567 A.2d 750 (1989), where we declined to quash an appeal taken before disposition of exceptions to the trial court's initial order. In *Bangor Memorial Park* we noted that the exceptions in the trial court raised the identical issues raised on appeal.

Here, we decline to quash the appeal from the First Order, and we treat the Philadelphia Parties' notice of appeal as having been filed on the date of the Second Order. The issues presented to the trial court in the post-trial motions are identical to the issues presented to us now. This approach is consistent with appellate procedural rule and case law, and it promotes judicial economy.[7]

## II. Intervention

The trial court allowed the remote Philadelphia Parties to intervene in the Luzerne County tax assessment case on two theories: a right to intervene under the General County Assessment Law (GCAL);[8] and permissive intervention under Pa. R.C.P. No. 2327(4) (intervention permitted if the determination of such action may affect any legally enforceable interest of such person, whether or not such person may be bound by a judgment in the action).

The local taxing authorities have an interest in the assessment of the plant's utility realty for tax years 2000 and beyond because in those years the tax is payable under the GCAL. The only tax years in dispute in the Philadelphia Parties' appeal are 1998 and 1999.

The assessment of the utility realty for the years in question is used to calculate taxes payable under PURTA to the Commonwealth, which then distributes the revenues to municipal governments, school districts, and mass transit authorities. It is undisputed that the City and the School District are entitled to approximately 20% of the total PURTA tax revenues for 1998 and 1999. In those years, SEPTA is entitled to two-thirds of the revenue of the PURTA-funded public transportation assistance fund. In contrast, the local taxing authorities were due to receive only 0.4% of total PURTA revenues in each of those

---

7. As a result of our approach, we need not address the questions of whether the premature appeal divested the trial court of jurisdiction and whether judicial estoppel precludes PP & L from seeking to quash the appeal from the First Order.

8. Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. §§ 5020–101—5020–602.

years, and none of the transportation funds.

It is unclear what effect, if any, the assessment appeals will have on the actual PURTA distributions to the Philadelphia Parties for 1998 and 1999.

### A. Intervention as of Right

■ Philadelphia Parties claim a right to intervene under Section 520 of the GCAL, 72 P.S. § 5020–520, and under Section 18 of the Second Class A and Third Class County Assessment Law,[9] 72 P.S. § 5350i (TCCAL). Section 520 of the GCAL provides, with emphasis added:

> *The corporate authorities* of any county, city, borough, town, township, school district or poor district, *which may feel aggrieved by any assessment of any property or other subject of taxation for its corporate purposes, shall have the right to appeal therefrom* in the same manner, subject to the same procedure, and with like effect, as if such appeal were taken by a taxable with respect to his property.

The TCCAL section begins with virtually identical language and then closes with the following express language concerning intervention: "Such authorities may intervene in any appeal by a taxable under section 9 of this Act as a matter of right."

PP & L argues that the Philadelphia Parties do not qualify for intervention as of right. Primarily, PP & L raises a statutory construction argument: the statutory reference to assessment of any property "for its corporate purposes" implies that intervention as of right is allowed only for properties which a taxing authority can

itself tax. Because the Philadelphia Parties cannot directly tax the Luzerne County parcels at issue here, because permitting intervention creates the absurd result of numerous, remote intervenors and opens the floodgates of PURTA litigation, and because a taxation statute must be strictly construed against the government, PP & L urges that the statute be interpreted so that no statutory right of intervention arises here.

We agree with the arguments raised by PP & L regarding statutory construction. There is no clear statutory authority permitting a remote taxing authority to intervene in a tax assessment appeal. Moreover, granting intervention as of right creates the absurd potential of numerous, remote intervenors in similar cases, contrary to the presumed intention of the General Assembly. 1 Pa.C.S. § 1922(1) (a court may presume the General Assembly did not intend a result that is absurd, impossible of execution or unreasonable). Accordingly, we construe the language of Section 520 of the GCAL and Section 9 of the TCCAL as limiting intervention as of right to those taxing authorities which may directly tax the property in question "for its corporate purposes."

### B. Permissive Intervention

■ Philadelphia Parties contend they meet the requirements for permissive intervention under Pa. R.C.P. No. 2327(4). They argue they have a legally enforceable interest in receipt of tax revenue under PURTA and the transportation fund. Philadelphia Parties rely on two cases which do not address PURTA.[10] They

---

9. Act of June 26, 1931, P.L. 1379, *as amended,* 72 P.S. § 5350i.

10. *Tremont Township Sch. Dist. v. W. Anthracite Coal Co.,* 381 Pa. 276, 113 A.2d 234 (1955) (county claiming ownership of land permitted intervention in execution attach-

ment against former owner of land for coal removed); *Marx v. Bd. of Prop. Assessment, Appeals and Review of Allegheny County,* 31 Pa.Cmwlth. 496, 377 A.2d 199 (1977) (city had standing to appeal order reducing assessment of property located in city).

also argue that their interests were not adequately represented by the local taxing authorities who settled their dispute, and for support they rely on *Keener v. Zoning Hearing Bd. of Millcreek Township*, 714 A.2d 1120 (Pa.Cmwlth.1998) (township no longer adequately represented interests of another party where township entered into settlement agreement).

PP&L argues that the Philadelphia Parties lack a legally enforceable interest in PURTA distributions. Factually, it argues the effect of this litigation on the amount of distribution is uncertain. In this regard, PP & L highlights an admission in the Philadelphia Parties' brief that the outcome of the trial would have no effect on the amount of their 1998 PURTA distribution and an admission at trial that they do not know whether the outcome would effect their 1999 PURTA distribution.

Legally, PP&L relies on *Springdale Township v. Allegheny County Bd. of Prop. Assessment, Appeals and Review*, 78 Pa.Cmwlth. 100, 467 A.2d 74 (1983). In that case, a utility challenged an appeal taken by taxing authorities from the assessment of its power plant. The utility asserted exclusive jurisdiction in the Public Utility Commission because the Commonwealth collected PURTA taxes and was therefore an indispensable party. We held that while a decision on assessment of the power plant "could have some slight effect upon state revenues otherwise, that tenuous and speculative connection does not raise the Commonwealth to the level of an indispensable party." *Id.* at 77. PP&L argues here that if the entity which collects PURTA tax has a tenuous and speculative connection to the assessment of one piece of property, surely the parties that receive distributions have an interest even more tenuous and speculative.

Relying on Pa. R.C.P. No. 2329, PP & L further argues that the interests of the Philadelphia Parties were adequately represented by the local taxing authorities. Pa. R.C.P. No. 2329(2) (intervention may be denied where the interest of petitioner is already adequately represented). Also, PP & L suggests that intervention should have been denied because the Philadelphia Parties delayed in requesting intervention. Pa. R.C.P. No. 2329(3) (intervention may be denied where petitioner unduly delays in application, or intervention will unduly delay trial).

We reject the arguments of PP & L on permissive intervention. The Philadelphia Parties historically receive a significant portion of PURTA distributions. Moreover, they are entitled by statute to receive the distributions. Section 107 of PURTA, 72 P.S. § 8107–A. Suit to enforce this interest may be maintained. *Townships of Springdale and Wilkins v. Kane*, 11 Pa.Cmwlth. 254, 312 A.2d 611 (1973), *aff'd sub nom.*, 463 Pa. 554, 345 A.2d 658 (1975). Intervention is permissible if the determination "may affect any legally enforceable interest." Pa. R.C.P. No. 2327(4). Intervention is not conditioned on prior quantification of the effect of the litigation.

Moreover, the interests of the Philadelphia Parties were not adequately represented by the local taxing authorities, who settled their dispute. *Keener.*

Finally, the trial court did not abuse its discretion in permitting intervention a year into the litigation. *See In re Rowan*, 763 A.2d 958 (Pa.Cmwlth.2000). This is especially true where PP & L assigns no prejudice to the delay. The trial court is in the best position to decide whether late intervention is consistent with its calendar responsibilities.

For the foregoing reasons, we reject intervention as of right by the remote taxing authorities, but we affirm the trial

court's permissive intervention under the limited opportunity created by the retroactive PURTA amendment.

## III. Valuation

The plant was built at a cost of over $4 billion. It is an income generating asset, having generated net income of more than $154 million in 1998.

The assessment board determined the fair market value of the property was $3.9 billion in 1998 and $3.8 billion in 1999. On appeal, the trial court accepted in total the valuation testimony presented by PP & L and valued the property at approximately $57 million in 1998 and $71 million in 1999.[11]

The Philadelphia Parties assign the following four errors: the trial court rejected the income approach to valuation; the trial court misapplied the cost approach to valuation; the trial court used the wrong definition of taxable utility realty; and, the trial court failed to consider the impact of the award of stranded costs, $1.5 billion of which was attributable to the plant.

Under Section 402 of the GCAL, 72 P.S. § 5020–402(a), all objects of taxation shall be valued

> according to the actual value thereof, and at such rates and prices for which the same would separately bona fide sell.... In arriving at the actual value, all three methods, namely, cost (reproduction or replacement, as applicable, less depreciation and all forms of obsolescence), comparable sales and income approaches, must be considered in conjunction with one another.

*Id.* As amended, PURTA requires valuation of utility realty "in the same manner as is provided for by law for the assessment, valuation and enrollment of real estate." 72 P.S. § 8105–A(a).

■ In tax assessment appeals, actual value or fair market value is determined by competent witnesses testifying as to the property's worth in the market; i.e., the price a willing buyer would pay a willing seller, considering the uses to which the property is adapted and might reasonably be adapted. *Allegheny Energy Supply* (citations omitted).

### A. Income Approach

■ The income approach assumes that an investor would set a price for a property based on a projected income stream that would produce an acceptable return on the capital invested in its purchase. *Appeal of V.V.P. Partnership,* 167 Pa.Cmwlth. 282, 647 A.2d 990 (1994). The income stream is capitalized to present value using an appropriate discount rate. *Id.*

The trial court determined that the income approach was not controlling "because there is no reasonable way to separate the portion of the income stream attributable solely to taxable realty from the income stream attributable to the business enterprise located on the Tax Parcels." R.R. at 286a–87a.

Philadelphia Parties assert the trial court's rejection of the income approach was error. They raise numerous arguments in support of this assertion: the court must consider the income approach under Pennsylvania law; the income ap-

---

11. Shortly after trial commenced, the trial court approved a Stipulation between PP & L and the local taxing authorities (without prejudice to the Philadelphia Parties) under which the property was valued at approximately $57 million for 1998, approximately $71 million for 1999, $100 million for 2000 and approximately $164 million for 2001. R.R. at 146a–47a. This court-approved Stipulation resolved the litigation involving the local taxing authorities.

proach is the most appropriate approach for appraising property typically purchased as an investment because such property is valued by its purchaser for its ability to produce income, *V.V.P.*; the trial court erred in relying on condemnation cases; evidence showed that the income approach best reflected economic reality; the trial court erred in relying on *F & M Schaeffer Brewing Co. v. Lehigh County Bd. of Appeals*, 530 Pa. 451, 610 A.2d 1 (1992) (assessment may not include value-in-use) because that case is distinguishable; and, PP & L's expert was incompetent because of a lack of knowledge of the industry and lack of knowledge of the impact of deregulation.

PP&L contends the trial court properly adopted its proposed findings and conclusions in total. It raises various points in support of its contention: the trial court properly considered and rejected the income approach, specifically the rental-based income approach, where there was no indication that the plant would be leased; the case on which the Philadelphia Parties rely, *V.V.P.*, provides that the income approach is appropriate *if* you can separate the income stream from the property and the income stream from the business on the property; both assessment cases and condemnation cases require the exclusion of business income in valuation, citing *Willow Valley Manor, Inc. v. Lancaster County Bd. of Assessment Appeals*, 810 A.2d 720 (Pa.Cmwlth.2002), *appeal denied* 572 Pa. 769, 819 A.2d 549 (2003); the trial court appropriately recognized the economic reality of business income and the problem of distinguishing it from income generated by the property itself; *F & M Schaeffer* applies, and attempts to distinguish it are unpersuasive; and, Philadelphia Parties' valuation expert recognized that business income cannot be used to value real property.

 The trial court's duty in an assessment appeal is to weigh the conflicting expert testimony and determine a value based upon credibility determinations. *Air Prods. & Chems., Inc. v. Board of Assessment Appeals*, 720 A.2d 790 (Pa. Cmwlth.1998). The trial court has the discretion to decide which of the methods of valuation is the most appropriate and applicable to the given property. *Willow Valley Manor.*

 Our review in a tax assessment appeal is narrow such that the trial court's valuation will be affirmed unless its findings are not supported by substantial evidence or it abused its discretion or committed an error of law. *Id.* The trial court's findings are entitled to great deference, and its decision will not be disturbed absent clear error. *Id.*

Here, the trial court's findings, which adopt PP & L's well-documented proposed findings, are clearly supported by substantial evidence. Findings 139–42, R.R. at 196a–97a. Challenges to PP & L's evidence on valuation raise issues of credibility, which the trial court resolved in favor of PP & L. These determinations will not be disturbed.

Nor did the trial court commit an error of law. Contrary to claims by the Philadelphia Parties, the trial court considered all three approaches to valuation. Finding 65, R.R. at 177a. The trial court ultimately relied upon the cost approach to valuation because the other approaches were unreliable indicators of market value of the taxable utility realty. Finding 66, R.R. at 177a. This is not error. *Willow Valley Manor.*

Further, it is not error to select an approach to valuation which focuses on the tax parcels themselves, as distinguished from the enterprise operating on the parcels, from the "value in use" of the parcels,

and from machinery, equipment and other intangible assets associated with the parcels. *See F & M Schaeffer; Allegheny Energy Co.* (applying amended PURTA). Nor was the trial court's search for guidance among tax assessment and condemnation cases error where those cases confirm the problems of the income approach to valuing real property when business income is also generated. *Willow Valley Manor; Murray v. Pennsylvania Tpk. Comm'n (In re Condemnation of 1.169 Acres),* 745 A.2d 66 (Pa.Cmwlth.2000).

For the foregoing reasons, we reject the arguments raised by the Philadelphia Parties regarding the income approach to valuation.

## B. Cost Approach

■■■■■ The trial court accepted the testimony of PP & L's expert, who relied most heavily on the cost approach. The parties agree that cost approach to value is based on the concept that an informed investor would not willingly pay more for the subject property than would be necessary to develop an alternative providing economically equivalent benefits. The cost approach uses the following formula: 1) the estimated value of the land, which is assumed to be vacant and available for its highest and best use, added to 2) the estimated reproduction cost of the facility, less depreciation. *Allegheny Energy Supply.* The value of the property for a specific use and the value of that use to the current owner are not relevant in determining fair market value. *Id.*

Philadelphia Parties assert the trial court erred in its estimate of the reproduc-

tion cost of an equivalent facility and erred in subtraction of depreciation. They generally raise two arguments. First, they contend the trial court erred in considering the expert's use of a hypothetical state-of-the-art gas-fired plant to evaluate functional obsolescence.[12] In this regard, they note a nuclear plant is significantly different than a gas-fired plant, a gas-fired plant is less efficient and therefore has far less utility; and the large gas-fired plant is hypothetical, there being none in operation.

Second, the Philadelphia Parties contend the trial court erred by double counting and inflating economic obsolescence[13] based on the "market extraction" approach used by PP & L's expert. This approach is totally unreliable and not supported by substantial evidence because, contrary to accepted appraisal principles: there are no plentiful sales at relevant valuation dates; the subject properties are not comparable, and the types and amounts of depreciation are therefore not similar; the compared sales were motivated by the possibility of stranded costs awards; and, the sales data are not clear.

In contrast, PP&L asserts use of the cost approach was totally appropriate. Responding to arguments about deductions for functional obsolescence, it contends consideration of a gas-fired plant producing the equivalent amount of electricity was appropriate in determining a deduction for functional obsolescence because: the principle of substitution, an accepted appraisal concept, permits consideration of a facility which would be much less costly to build; the trial court recognized that a gas-fired plant would be less effi-

---

**12.** Functional obsolescence is obsolescence attributable to the efficiency, overcapacity and inadequacy of the facility. *See Allegheny Energy Supply.*

**13.** Economic obsolescence is depreciation caused by unfavorable conditions external to the property such as the local economy, economics of the industry, loss of material and labor sources, and passage of new legislation. R.R. at 189a. *See Allegheny Energy Supply.*

cient and therefore *added* $495 million to $763.6 million to adjust for this inefficiency, Finding 99, R.R. 186a; and, such a plant was actually under construction in 1997 when the expert produced his report.

As to economic obsolescence, PP&L supports the trial court's estimation using data extracted from comparable sales because: the seven transactions described by the expert constitute plentiful sales, and the court may accept sales data near but after the date of valuation; the sales are comparable, and the expert made adjustments to compensate for differences; the sales where the possibility of stranded costs awards existed were required to be made at fair market value, and therefore they may be considered; the Philadelphia Parties do not specify the data lacking precision and do not specify prejudice; and the "market extraction" approach as applied here is recognized by experts, contrary to the arguments of the Philadelphia Parties.

Most of the arguments raised by the Philadelphia Parties on the cost approach involve questions of credibility. These issues were properly addressed to the factfinder, and they were resolved in favor of PP & L. As the trial court's findings are amply supported by the testimony of PP & L's witnesses, they will not be disturbed on appeal. *Willow Valley Manor.*

In *Allegheny Energy Supply,* we recently dealt with evaluation of utility realty under the recent PURTA amendments. After referencing the valuation provisions of GCAL, previously cited, we stated:

> Certainly, the value of improvements should be reduced to reflect functional obsolescence, in terms of the loss in value cause[d] by overcapacity and inadequacy, and to reflect economic obsolescence, the loss in value attributable to the lack of economic demand.

788 A.2d at 1093. Clearly, pursuant to the statutes and interpretive cases the deductions taken for obsolescence here were permitted by law.

Significant deduction was taken for functional obsolescence due to excess capital costs, Findings 74–92, R.R. at 179a–84a, and excess operating costs. Findings 93–101, R.R. at 184a–87a. Among other things, the trial court considered advances in the technology of gas-fired plants, the high cost and long construction lead times in erecting nuclear-powered facilities (none of which have been ordered in the United States since 1979), and prior inconsistent statements by the Philadelphia Parties' expert. The trial court also considered huge annual contributions to the plant's decommissioning trust fund. Findings 102–08, R.R. at 187a–88a.

The trial court has discretion to decide which of the methods of valuation is most appropriate. *Willow Valley Manor.* Given the significant changes in electric generation since plant construction was permitted in 1973, Findings 31–37, R.R. at 168a–70a, it is neither error nor an abuse of discretion to evaluate functional obsolescence by comparing the plant's capital costs and operating costs with those of a state-of-the-art gas-fired plant producing the equivalent amount of electricity.

Similarly, significant deduction was taken for economic obsolescence. The trial court adopted the market extraction method employed by PP & L's expert, by which economic obsolescence is estimated using information extracted from sales of comparable nuclear plants. Findings 109–113, R.R. at 189a–90a. It was within the trial court's discretion to accept the data from other sales as estimating economic obsolescence, and no abuse of that discretion is evident.

The Philadelphia Parties argued to the trial court that PP & L's approach double-

counted and inflated obsolescence. The trial court rejected this argument. There is nothing in the facts as found by the trial court that requires a reversal of this determination.

As explained, we see no merit in the arguments of the Philadelphia Parties on the cost approach to valuation.

## C. Exclusion of Machinery and Equipment from Definition of Taxable Utility Realty

█ The trial court accepted the approach of PP & L's expert, which excluded machinery and equipment from the definition of taxable utility realty based on information compiled by a PP & L engineer.

PURTA's definition of taxable "utility reality" expressly excludes "machinery and equipment." [14] Neither the statute nor any applicable case defines machinery and equipment for PURTA purposes.

The Philadelphia parties claim the trial court erred in accepting the approach of PP& L's expert. Specifically, they claim that by doing so the trial court essentially adopted the definition of machinery and equipment from other statutes, contrary to PURTA. Also, they claim the trial court erred in failing to follow the law of fixtures, citing *Allegheny Energy Supply.*

Finally, they argue PP& L's expert was so unreliable as to be incompetent as a matter of law, and his testimony does not constitute substantial evidence to support the trial court's findings.

PP&L supports the trial court's approach. It counters that neither the statute nor cases define machinery and equipment under PURTA. Thus, those terms may be construed as they are normally understood. Also, it notes no PURTA-specific cases support the contention that the law of fixtures controls. Finally, PP&L contends its engineer's review was thorough, reliable, and consistent with law.

The trial court did not commit error when it construed the terms "machinery and equipment," otherwise undefined in PURTA, according to their common and approved usage. 1 Pa.C.S. § 1903(a) ("Words and phrases shall be construed ... according to their common and approved usage...."). Using this rule of construction, the trial court essentially accepted the classifications made by PP & L's engineer which reflected his extensive knowledge of the plant, his engineering background, accounting records and guidance from counsel. Findings 143–78, 471–82, R.R. at 197a–204a, 276a–79a.

---

**14.** 72 P.S. § 8101–A(3)(with emphasis added): *"Utility realty." All lands, together with all buildings,* towers, smokestacks, dams, dikes, canals, cooling towers, storage tanks, reactor structures, pump houses, supporting foundations, enclosing structures, supporting structures, containment structures, reactor containment outer shells, reactor containment vessels, turbine buildings, recovery tanks, solid waste area enclosures, primary auxiliary buildings, containment auxiliary safeguard structures, fuel buildings, decontamination buildings, *and, all other structures and enclosures whatsoever which are physically affixed to the land, no matter how such structures and enclosures are designated and without regard to the classification thereof for local real estate* taxation purposes, *but not including machinery and equipment,* whether or not housed within such building, structure or enclosure, or, after December 31, 1999, land and improvements to land that are indispensable to the generation of electricity, located within this Commonwealth that at the end of the taxable year are owned by a public utility or its affiliate either directly or by or through a subsidiary and are used or in the course of development or construction for use, in whole or in part, in the furnishing, including producing, storing, distributing or transporting, of public utility service and which are not subject to local real estate taxation under any law in effect on April 23, 1968.

PURTA specifically provides that it "shall not be construed ... in pari materia with any county assessment law...." Section 108 of PURTA, 72 P.S. § 8108–A. Also, the definition of utility realty provides that a determination shall be made "without regard to the classification thereof for local real estate taxation purposes." Section 103 of PURTA, 72 P.S. § 8103–A(3). Philadelphia Parties argue that PP & L's engineer relied on legal advice addressing the machinery and equipment exclusion in cases under a different assessment law, contrary to these statutory proscriptions.

This argument would be more persuasive if the challenged classifications were based on legal guidance alone. However, they were based on much more than advice of counsel. Faced with highly specialized items, many dealing with the reactor, the trial court confirmed a multi-disciplinary, four-part process to identify nontaxable machinery and equipment. Findings 155–57, R.R. at 200a–01a. The process combined engineering, accounting, legal and common sense elements. The trial court was persuaded that the culmination of the process was a determination of "property commonly understood to be machinery and equipment." Finding 158, R.R. at 201a. As discussed, there is no error in construing statutory terms according to their common and approved usage.

Seeking to add the value of the expensive contested items affixed to the land, such as the reactor recirculating system, residual heat removal system, reactor building closed cooling water system, reactor instrumentation, turbogenerator turbine, condenser and circulating water system, the Philadelphia Parties' claim that the law of fixtures controls. We disagree.

Under the statutory definition, utility realty includes all lands, buildings, "and all other structures and enclosures whatsoever which are physically affixed to the land ... but not including machinery and equipment...." 72 P.S. § 8101–A(3).[15] Utility realty includes land and items affixed to the land. In addition, utility realty excludes machinery and equipment. The definition of utility realty utilizes both concepts, and neither one trumps the other. The trial court's analysis was consistent with law insofar as it considered both whether an item was affixed to the land and whether an item was machinery and equipment. We decline the Philadelphia Parties' invitation to follow non-PURTA cases to a different conclusion.[16]

Finally, we reject challenges to the competence of PP & L's witnesses. The challenges do not rely on legal authority; rather, they raise factual arguments. The trial court properly considered these arguments as raising questions of credibility, which it resolved in favor of PP & L. No error is present in this resolution. *Willow Valley Manor.* The testimony of PP & L's witnesses supports the trial court's findings.

### D. Exclusion of Stranded Costs

Before September 1, 1997, the consensual date of valuation for the 1998 tax year, PP & L filed an application for

---

15. We reject Philadelphia Parties' apparent suggestion that the machinery and equipment exclusion only applies after December 31, 1999. The machinery and equipment exclusion predates the recent amendments to PURTA.

16. *Clayton v. Lienhard,* 312 Pa. 433, 167 A. 321 (1933); *Kipps v. Susquehanna County Bd. of Assessment,* 743 A.2d 539 (Pa.Cmwlth. 1999); *Arredondo v. Cumberland County. Bd. of Assessment,* 697 A.2d 614 (Pa.Cmwlth. 1997); *Appeal of Sheetz,* 657 A.2d 1011 (Pa. Cmwlth.1995).

return of stranded costs.[17] Before September 1, 1998, the consensual date of valuation for the 1999 tax year, the stranded costs award was finalized, but not paid. PP & L received an award of $1.5 billion related to the plant. The award was securitized.[18]

The trial court found "all the evidence established that PPL's right to receive [stranded costs] had no effect on [the plant's] fair market value." R.R. at 272a–73a. Also, the trial court found "there is no evidence in this case that PPL's right to [stranded costs] has any effect on the price a buyer would pay for [the plant]." R.R. at 273a.

The Philadelphia Parties assert the trial court erred in failing to consider the award of stranded costs because the expectation of recovery on the valuation dates was part of the economic reality of the plant that must be considered, citing *Parkside Townhomes Assocs. v. Bd. of Assessment Appeals*, 711 A.2d 607 (Pa.Cmwlth.1998) (federal tax credits available to owner were relevant to the actual value of a low-income housing complex) and *Cedarbrook Realty, Inc. v. Cheltenham Township*, 148 Pa.Cmwlth. 310, 611 A.2d 335 (1992). They also assert that on the applicable dates stranded costs were inseparable from the plant. On this assertion they rely in part on an auditor's report prepared for PP & L and in part on provisions of the Competition Act.[19]

PP&L supports the trial court's rejection of the Philadelphia Parties' approach because a stranded costs award is not utility reality as defined by PURTA; rather, it is a right to a future income stream based on prior investment in generation-related assets made in reliance on the previous regulatory structure. Also, stranded costs are transferable and separate from the tax parcels, and these stranded costs were securitized.

Section 4 of the Competition Act, 66 Pa.C.S. § 2812(g) defines "intangible transition property" as the property right created by a qualified rate order, including all revenues pursuant to that order. *See Indianapolis Power & Light Co. v. Pennsylvania Public Utility Comm'n*, 711 A.2d 1071 (Pa.Cmwlth.1998). A qualified rate order is the statutory term for what the trial court and the parties here refer to as a stranded costs award. *See generally* 66 Pa.C.S. § 2812. After issuance of the qualified rate order, the electric utility may "assign, sell or otherwise transfer intangible transition property or . . . cause the transition bonds to be issued. . . ." 66 Pa.C.S. § 2812(a)(1). *See also* 66 Pa.C.S. § 2812(e)(discussing "true sale" of intangible transition property). Thus, under the Competition Act, the rights arising from a stranded costs award may be assigned, sold or otherwise transferred.

Because the rights arising from a stranded costs award may be transferred

---

17. "Transition or stranded costs" arise from deregulation. They are those costs that a utility appropriately incurred and prudently expended under a regulated regime but which would not be recovered under deregulation and competition. *See* Section 4 of the Competition Act, 66 Pa.C.S. § 2803.

18. The process of securitization converts the utility's entitlement to receive future transition charges from its customers into a current, fully vested property right that may be pledged or sold as security for the issuance of

transition bonds. *Indianapolis Power & Light Co. v. Pennsylvania Public Utility Com'n*, 711 A.2d 1071 (Pa.Cmwlth.1998).

19. Section 4 of the Competition Act, 66 Pa. C.S. § 2808(a) (stranded cost recovery associated with existing generating facilities is contingent on continued operation at reasonable availability levels of those generation facilities), and 66 Pa.C.S. § 2812(b)(2) (utilities receiving stranded costs must use the awards to defray their actual stranded costs).

to and received by someone other than the owner of the utility realty, there is no legal requirement that the award be considered part of utility realty. In other words, because the rights may be separated from the utility realty, rights arising from the award are not part of utility realty as a matter of law. Cases and statutory provisions referenced by the Philadelphia Parties do not provide otherwise.

The question then becomes a factual one: how, if at all, will an application for and award of stranded costs influence "the price which a purchaser, willing but not obligated to buy, would pay an owner, willing but not obligated to sell...." 72 P.S. § 8105–A.

For the tax year 1998, before a stranded costs award was made, it is unclear that a willing purchaser would pay for or receive the subsequent award. For tax year 1999, after an award was made but before it was payable, it is possible but not certain that a willing purchaser would pay for the award and would require that it "run with the land." The trial court resolved the factual question and found "there is no evidence in this case that PP & L's right to [stranded costs] has any effect on the price a buyer would pay for [the plant]." Finding 463, R.R. at 273a. This finding is supported by the record, *see* Finding 462, R.R. at 272a–73a, and it resolves the issue.

As discussed, we reject the argument that the trial court's evaluation was flawed by its failure to include that stranded costs award.

### IV. Conclusion

The Philadelphia Parties complain bitterly that the trial court adopted the proposed findings and conclusions submitted by PP & L without separate discussion and analysis. After amassing a prodigious record, the trial court embraced PP & L's proposed 498 Findings, covering 136 pages, while rejecting a submission of comparable magnitude from the Philadelphia Parties.

We find no error in the trial court's adjudication procedures. *See Eighth North–Val, Inc. v. Parkinson Pension Trust,* 773 A.2d 1248 (Pa.Super.2001); *Commonwealth ex rel. Bloomsburg State Coll. v. Porter,* 148 Pa.Cmwlth. 188, 610 A.2d 516 (1992). Rather, the trial court patiently permitted the parties to make a record exquisite in detail. Further, the trial court professionally resolved all outstanding issues. No criticism of the trial court is supported by this record.

Considering the foregoing discussion, we deny the motion to quash, affirm permissive intervention, and affirm the order denying the Philadelphia Parties' post-trial motions.

### ORDER

AND NOW, this 28th day of October, 2003, Motion to Quash appeals from the Order dated April 9, 2002, and filed May 9, 2002, is DENIED. Order of August 18, 2000, permitting intervention, is AFFIRMED. Further, Orders dated July 10, 2002, and filed July 11, 2002, denying post-trial motions are AFFIRMED.