611 A.2d 335

**CEDARBROOK REALTY, INC., Appellant,**

v.

**CHELTENHAM TOWNSHIP and Cheltenham Township School District and Montgomery County Board of Commissioners and Montgomery County Board of Assessment Appeals, Appellees.**

**CEDARBROOK REALTY, INC., Appellant,**

v.

**MONTGOMERY COUNTY BOARD OF ASSESSMENT AP-PEALS and Cheltenham Township School District and Montgomery County Board of Commissioners and Cheltenham Township, Appellees.**

Commonwealth Court of Pennsylvania.

Argued Nov. 22, 1991.

Decided June 2, 1992.

Reargument Denied July 20, 1992.

Henry T. Reath, for appellant.

Albert L. Foster, for appellee, Montgomery County Bd. of Assessment Appeals.

Kenneth A. Roos, for appellees, Cheltenham School Dist.

Before COLINS and KELLEY, JJ., and LEDERER, Senior Judge.

COLINS, Judge.

This is an appeal from an order of the Court of Common Pleas of Montgomery County (common pleas) dismissing exceptions filed by Cedarbrook Realty, Inc. (Cedarbrook) and setting final real estate tax assessments for Cedarbrook Hill Apartments (the subject property) for the tax years 1982 through 1990, inclusive. In setting these assessments, common pleas based its determination on data furnished by the Montgomery County Board of Assessment Appeals (Board).[1]

Initially, in 1982, Cedarbrook appealed its assessed value as determined by the Board. Hearings took place in January, February, April and May of 1990, for a total of seventeen (17) days of testimony, including a view of the subject property by common pleas, and one full day closing argument in July, 1990. All parties were represented by counsel who presented qualified real estate appraisal experts Joel Kulick (Kulick) for Cedarbrook, and Reaves Lukens (Lukens) for the Board.

Common pleas made the following findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) Cedarbrook comprises three (3), approximately twelve (12) acre, parcels of land upon which are situate three (3) high-rise luxury apartment buildings.

(2) The apartment buildings consist of approximately one thousand (1000) luxury apartments in varying configurations comprising ninety-seven (97%) percent of available rental space, and commercial space consisting of professional offices, shops, and a restaurant accounting for the remaining three (3%) percent of available rental space.

(3) Although it is a commendable gesture of the individual owner, Mr. John Merriam, to maintain a country club and golf course for the tenants of Cedarbrook, the country club and golf course are a separate tax entity and are not an integral part of the subject property and tax base.

---

1. Appellees in this matter are the Montgomery County Board of Assessment Appeals, the Cheltenham Township School District, the Montgomery County Board of Commissioners and Cheltenham Township.

(4) The cost of operating the country club and golf course is not a proper expense of Cedarbrook.

(5) Cedarbrook is in a good, but not superior, location.

(6) Cedarbrook is convenient to public transportation, expressways, suburban shopping malls, and center city Philadelphia.

(7) The surrounding residential and commercial neighborhoods are deteriorating.

(8) Cedarbrook is isolated from the surrounding neighborhoods and buffered by the size of the parcels themselves, the country club and golf course, adjacent roadways and expressways, a cemetery, fencing, and security forces.

(9) Due in part to its age and location, Cedarbrook is no longer insurance company investment grade property.

(10) Maintenance at Cedarbrook is good but not superior.

(11) The management staff at Cedarbrook is competent and dedicated.

(12) The vacancy rate experienced by Cedarbrook is singularly higher than that experienced by other apartment complexes in the Philadelphia area.

(13) Management policies and decisions to maintain a certain clientele profile have resulted in a rent structure significantly higher than that which would 'fill up' existing vacancies.

(14) There is some merit in the contention a neighboring cemetery has an adverse effect upon the occupancy of one of the apartment buildings.

(15) The surrounding neighborhoods have a negative effect on occupancy.

(16) The so-called Feld incident of 1975[2] had an adverse effect on occupancy at the time of the occurrence and shortly thereafter. It did not have a continuing impact over the following decade.

(17) Apartments have remained vacant for in excess of two (2) years.

---

**2.** The Feld incident involved an atrocious assault on an elderly resident of Cedarbrook in the Cedarbrook parking lot.

(18) Cedarbrook's expenses and expense to income ratio are abnormally high in comparison to similar apartment complexes in the area and published reports.

(19) The high expenses experienced by Cedarbrook are in large measure a result of non-metering of tenants' electricity, the employment of Teamster Union workers, and the size, age, and condition of the buildings.

(20) Decreasing rental charges would increase occupancy.

(21) An increase in occupancy will increase expenses.

(22) The abnormally high vacancy rate and expenses distorts the Income Approach to Market Value.

(23) The singular high vacancy rate and expense to income ratio experienced at Cedarbrook require adjustments be made when employing the Income Approach to Market Value.

(24) Including the expense of operating the country and golf course distorts the Income Approach to Market Value.

(25) Taxpayer's expert appraiser, Mr. Joel Kulick's stabilization of occupancy at seventy-five (75%) percent for a three (3) year period is not what a sage and circumspect purchaser would expect to achieve.

(26) Mr. Kulick's stabilization of occupancy at a high of eighty-eight (88%) percent is not what that same purchaser would expect to achieve.

(27) The taxing authorities' expert appraiser Mr. Reaves Lukens' stabilization of occupancy immediately at ninety-five (95%) percent is somewhat aggressive although this is the rate an aggressive purchaser would expect to achieve eventually.

(28) Mr. Kulick's income approach valuations for Cedarbrook for the period 1982 through 1990 are too low due in large measure to stabilizing occupancy too low and incorporating the expense of the country club and golf course in his calculations.

(29) Mr. Lukens' income approach valuations for Cedarbrook for the period 1983 through 1990 are somewhat high due in large measure to stabilizing expenses too low in his calculations,

(30) Cedarbrook's size, age, and location somewhat distorts the Market or Sales Approach to Market Value.

(31) No identical property exists in the Philadelphia area.

(32) Adjustments can be made to permit credible comparisons between recent apartment sales in the Philadelphia area and Cedarbrook to arrive at a market value.

(33) There is some merit to the argument that condominium sales are not comparable to or with apartment sales. However, adjustments can be made to allow comparison of condominium sales with apartment sales, and in particular Cedarbrook, to arrive at a market value.

(34) Mr. Kulick believed Cedarbrook was unequivocally unique and not comparable to or with any apartment complex in the Philadelphia area.

(35) Mr. Kulick's market approach valuations of Cedarbrook are not indicative of Cedarbrook's market value.

(36) Mr. Lukens believed Cedarbrook was comparable to other apartment complexes in the Philadelphia area.

(37) Mr. Lukens' market approach valuations of Cedarbrook are indicative of Cedarbrook's market value.

(38) The market value of Cedarbrook in 1963 was Twenty-nine Million ($29,000,000.00) Dollars. This value was determined by an appraisal performed and a seventy-five (75%) percent mortgage (Twenty-two Million ($22,000,000.00 Dollars) provided by Prudential Insurance Company in 1963.

(39) What were labeled 'Judge Davenport's ratios' are the assessment ratios as determined by the State Tax Equalization Board (STEB ratios).

(40) An approximate two (2) year 'lag' in the calculation and publishing of the STEB ratios occurred in the year 1982. Thereafter, the STEB ratios have been calculated and published six (6) months after each subsequent year's end.

(41) Utilizing taxpayer's expert, Dr. Linnemann's method for determining an assessment ratio, results in a 'lag' due to accumulating and processing yearly sales data.

(42) The General Assembly of the Commonwealth has determined and enacted the procedures and methods to be utilized for tax assessment appeals.

(43) The procedure and methods enacted are not perfect. However, imperfections will likely be present in any tax assessment appellate procedure and methodology.

(44) Taxpayer did not present convincing evidence of a 'more perfect' and nondiscriminating procedure and methodology to utilize for tax assessment appeals.

(45) The Montgomery County Board of Assessment Appeals presented its assessments of Cedarbrook for the years 1982 through 1990. The assessment was Three Million Four Hundred Ten Thousand ($3,410,000.00) Dollars for each year.

(46) Taxpayer appealed the 1982 assessment.

(47) Litigation pursuant to taxpayer's 1982 appeal has been continuous.

(48) The Court's final determination of taxpayer's 1982 appeal is being entered in 1990.

## CONCLUSIONS OF LAW

(1) The Board of Assessment Appeals established its *prima facie* case of the assessment of taxpayer's property.

(2) Taxpayer presented credible expert testimony and documentary evidence in its challenge of the Board's assessment.

(3) The taxing authorities presented credible expert testimony and documentary evidence to rebut taxpayer's evidence.

(4) The expert testimony and documentary evidence is conflicting.

(5) The Court determined the fair market value of the property after weighing and considering all evidence.

(6) The country club and golf course is excluded from valuation of the property because it is a separate and distinct taxable entity.

(7) The STEB ratios are the ratios to be applied to market value to determine the assessed value of the property.

(8) The years subject to the Court's determination of market value, ratio and assessed value are 1982 through 1990.

(9) Taxpayer did not meet its burden of proving the appellate procedure and methodology of tax assessments as enacted by the General Assembly is unconstitutional.

Cedarbrook raises the following issues on appeal: (1) whether common pleas erred in finding the direct sales comparison or market data approach[3] presented by the Board's appraisal expert more appropriate in determining Cedarbrook's assessment than the income approach[4] relied upon by Cedarbrook's appraisal expert; (2) whether common pleas erred in adopting the Board expert's exclusion of the operating expenses of the country club and golf course as being tax parcels separate from Cedarbrook; and (3) whether common pleas erred in applying 1982 STEB ratios to calculate Cedarbrook's 1984 assessment value.

Cedarbrook first argues that common pleas erred in determining its assessed value for the years 1982 through 1990 based on evidence submitted by Lukens who, according to Cedarbrook, incorrectly emphasized a direct sales comparison approach to determine market value, instead of the more appropriate income capitalization method advocated by Kulick. In this respect, Cedarbrook contends that, according to accepted principles of real estate valuation, income producing real property, such as the subject property, is deemed to be unique, typically purchased as an investment, and that its earning power (ability to produce sufficient income to cover expenses and yield an adequate return on equity) is the key

---

3. The direct sales comparison approach, also known as market data approach to valuation, is the method most frequently used to appraise residential properties (single-family, owner-occupied houses, including condominiums, resort or recreation property). This approach compares the subject property to several similar properties with due consideration given to the following factors: size, age, physical condition, location, neighborhood, extra amenities, date of sale, lot size, style of house, unique features and type of financing.

4. The income approach or capitalization method is used to appraise income producing real estate by dividing the annual net rental income (gross income minus expenses) expected from the property by the investment rate of return (the capitalization or "cap" rate) for that property.

element affecting its value.[5]

Cedarbrook also argues that although prior to trial, Lukens conceded that when valuing an income producing property, the *primary approach* is the income capitalization method, at the time of trial, he referred to having placed equal emphasis on the income capitalization and direct sales comparison approaches in arriving at Cedarbrook's assessed value. It is Cedarbrook's position that any reliance Lukens placed on the direct sales comparison approach (used for valuing property bought and sold on a frequent and regular basis) for valuing a "unique" or "special purpose" property like Cedarbrook was erroneous, in view of the small likelihood that a similar income producing property would be sold in the given market.

Secondly, Cedarbrook argues that what little deference common pleas gave to the income capitalization approach was undermined by reliance on Lukens' inaccurate capitalization rate (ignoring the fact that Cedarbrook was not investment grade real estate), and by inaccurate calculation of Cedarbrook's income and expenses in: (1) essentially adopting Lukens' theory that a 95% projected occupancy rate was viable for Cedarbrook when, in fact, the actual occupancy rate for 1982 was 67.89%; (2) failing to acknowledge that Cedarbrook's high vacancy rate was the result of external factors outside management's control; and (3) adopting Lukens' calculation of Cedarbrook's income that excluded expenses of operating the country club and golf course (optional amenities available to Cedarbrook residents by separate memberships) as not being integral parts of the subject property and its tax base.

Lastly, Cedarbrook contends that common pleas erred: (1) in failing to accept the uncontested testimony of its real estate economist, Dr. Peter Linnemann, as to the proper common level ratio [6] to use; and (2) in failing to select the most recent

---

5. Appraisal of Real Estate, 9th Edition, 1987, American Institute of Real Estate Appraisers.

6. Section 1.1 of what is commonly referred to as the Second Class County Assessment Law, 72 P.S. § 5452.1a provides in pertinent part: "Common level ratio' shall mean the ratio of assessed value to current market value used generally in the county as last determined by the

State Tax Equalization Board (STEB) ratio; and (3) in using STEB figures last published before the tax year in question, (that is, using the 1982 STEB ratio for Cedarbrook's 1984 taxes, rather than the 1984 STEB ratio published in June 1985). As a result of this error, Cedarbrook maintains that it was caused to incur additional tax liability of $433,421.00 over the 9-year period in question, as compared to a $927,784.00 refund it would have received had the correct ratios been used.

▪ Our scope of review in a tax assessment appeal is limited to a determination of whether the trial court abused its discretion, committed an error of law, or whether its decision is supported by substantial evidence. *Reichard–Coulston, Inc. v. Revenue Appeals Board Northampton County*, 102 Pa.Commonwealth Ct. 227, 517 A.2d 1372 (1986), *petition for allowance of appeal denied*, 517 Pa. 611, 536 A.2d 1335 (1987).

▪ In considering first whether common pleas erred in according greater weight to the direct sales comparison appraisal approach advanced by Lukens, the Board's expert, than to the income approach advanced by Kulick, we note that, in a property assessment appeal, the trial court's findings must be given great force and will not be disturbed absent clear error. *McGraw–Edison Company v. Washington County Board of Assessment Appeals*, 132 Pa.Commonwealth Ct. 437, 573 A.2d 248 (1990). Further, we have acknowledged repeatedly that the valuation of property is not an exact science and that it is the fact finder's role to determine the weight to be accorded an expert's testimony in this area. *B.P. Oil Co., Inc. v. Delaware County Board of Assessment Appeals*, 114 Pa.Commonwealth Ct. 549, 539 A.2d 473 (1988).

▪ Unarguably, common pleas has broad discretion in weighing and determining which factors presented by the parties herein are dispositive in determining the subject property's assessed value. Nevertheless, substantial evidence in the record supports Cedarbrook's contention that the Board's

State Tax Equalization Board pursuant to the act of June 27, 1947 (P.L. 1046, No. 447), referred to as the State Tax Equalization Board Law."

assessment methodology, and common pleas' reliance thereon, did not give adequate consideration to the very real and pressing demographic and economic problems that Cedarbrook, as opposed to other rental complexes in the area, confronts.

Specifically, in spite of substantial evidence presented by Cedarbrook detailing its particular problems that render it no longer "of investment grade," Lukens rejected Cedarbrook's position that it is a unique, income producing rental property, faced with a skyrocketing vacancy rate that precludes using the direct sales comparison approach customarily used to assess single family residences. This is evident during cross-examination of Lukens by Cedarbrook's counsel as follows:

BY MR. REATH:

Q. One of the premises that you have made that underlines your theory of valuation in this case is that this property would be rented at a 95 percent occupancy; correct?

A. That's correct, sir.

Q. Do you agree, as you've stated in your report at page 8, that the 1980 consensus recorded a modest growth of 3.1 for the County indicating a stabilization of population and that these trends are expected to continue?

A. No reason to question the accuracy of—

Q. What?

A. I have no reason to question the accuracy of that statement.

Q. And isn't it a fact—couldn't you conclude from that statement that you did not anticipate, or do not anticipate a significant population growth that would add an additional pool of potential tenants for this property?

A. I don't think there is a significant—necessarily a significant population growth expected, but there are other shifts in the composition of the population and, you know, the statistics are what the statistics are.

Q. And isn't it a fact that the 1980 population of Cheltenham Township decreased from 11.4 percent over the 1970 census data?

A. That's correct.

Q. Now, you would agree with me that location of a property is an important factor?

A. I would, sir.

BY THE COURT:

Q. The question is whether or not you took into account the expenses that would necessarily be incurred in bringing the occupancy rate up to 95 percent.

A. No, I did not.

BY MR. REATH:

Q. Again it is imperative, and that emphasis added is mine, 'It is imperative that the appraiser analyze comparable sales and derive their capitalization rates in the same manner used to analyze the subject property and capitalize its income' [sic] correct?

A. That's correct.

Q. And then it goes on to say, at the wrap-up of that section, there is a summary of the three conditions that must be met.

First, 'Income and expenses must be estimated on the same basis for the subject property and all comparable properties,' correct?

A. That's what it says.

Q. Secondly, 'Market expectations concerning resale prices, tax benefits and holding periods must be similar for all the properties,' correct?

A. That's what it says.

Q. And, third, that 'Financing terms and market conditions that affect the comparables must be similar to those affecting the subject property or an adjustment must be made for any dissimilarities,' correct?

A. Correct.

BY MR. REATH:

Q. Mr. Lukens, is it your personal judgment that the Feld incident did not have a significant effect on the Cedarbrook situation in terms of heightening the concern of the residents in the property because of its location?

MR. HIGH:

I just want to object to the relevancy. That was an incident that occurred in June of 1975. These appraisals go from '82 to '90. So the question of what the reaction of the tenants was at the time the Feld incident occurred is not relevant.

MR. REATH:

Your Honor, the testimony has shown that the Feld incident continued to stay alive until 1985, . . . .

THE COURT:

Well, I don't understand Mr. Lukens to say that the tragedy that befell Mr. and Mrs. Feld did not have an impact upon the tenants . . . .

I understand Mr. Lukens to say that in addition to that concern, there were other factors at work that played a role in the diminishing occupancy rate.

.    .    .    .    .

BY MR. McCORMICK:

Q. So then you don't disagree with the statement that the Sales Comparison Approach is usually used to price single family property?

A. Absolutely not. That's a true statement.

Q. That's all I wanted to establish?

The foregoing testimony is indicative of Cedarbrook's insistence that the direct sales comparison approach is only appropriate in valuing truly comparable properties that are purchased and sold regularly (clearly not the case at hand), since "of the *twelve* alleged 'Comparables' used to develop [Lukens'] 1982 value for Cedarbrook, a *rental* property, *eleven* were *sold for conversion to condominiums.*" Cedarbrook contends that using condominium type sales as a basis of comparison is inconsistent, since even Lukens previously conceded that the "highest and best" use of Cedarbrook was its continued use as

a rental property, which logically requires applying solely the income approach to assessed value.

In this regard, the rationale applied in the following recent decision of the Supreme Court, *Marple Springfield Center, Inc. Appeal,* 530 Pa. 122, 607 A.2d 708 (1992), although factually distinguishable from the present case, nonetheless warrants common pleas' consideration in determining the present Cedarbrook assessment. In *Marple Springfield,* appellant taxpayer owned land on which a shopping center was built, and disputed its assessment based on long-term contractual rent restrictions (not federally regulated) with its key tenant. In reversing our order that had set aside the trial court's use of the income approach to establish an income producing rental (albeit commercial) property's fair market value, the Supreme Court reasoned that:

> In the case of *In Re Johnstown Associates,* 494 Pa. 433, 431 A.2d 932 (1981), this court held that sale restrictions and rent restrictions, in the context of federally subsidized low-income apartment buildings, were factors taxing authorities must use in appraising property. The issue in this case is whether the holding in Johnstown Associates should be limited to federally-regulated properties, or whether legally binding rent restrictions should be considered by tax assessors of any property, whether or not the restrictions are due to federal regulation.
>
> .    .    .    .    .
>
> Under the assessment statute, ... there is no meaningful distinction between income restrictions based on applicable federal regulations, as in Johnstown Associates, and income restrictions based on bona fide contractual obligations, as in this case.
>
> .    .    .    .    .
>
> The capitalization-of-income approach to tax appraisals is the most appropriate if not the only valid means of establishing fair market value of real estate when the rental income is below what would otherwise be the current market level but for a long-term commercial lease, because such long-term leases are an accepted aspect of commercial real

324

estate transactions and their effects have a decisive impact on the price a buyer would pay for the affected property. To interpret the tax assessment statute as requiring valuation of property in hypothetical 'unencumbered form,' as Commonwealth Court did, is to ignore the economic realities of commercial real estate transactions.

*Marple Springfield*, 530 Pa. at 122, 123–126, 607 A.2d at 708, 709, 710.

Common pleas' finding that Cedarbrook was a completely unique project in the Philadelphia area, coupled with 12 comparables used by Lukens for his sales data which were, in fact, not comparable, undermine the validity of the "sales approach" relied on by common pleas. Using the sales approach for apartment complexes that were sold for conversion to condominiums, for the purpose of subsequent resale to individual owners, is not a true comparable in assessing the market value of a complex that is being used for continued rental operations. In the instant matter, the use of the market value approach ignores current economic realities of the real estate market, as well as the fact that Cedarbrook was developed and is presently being used as a "luxury apartment" complex.

More specifically, Cedarbrook consists of approximately 1,000 luxury apartments. (Common pleas' finding of fact No. 2). Therefore, the rent structure of the occupied apartments is based upon a rent structure similar to that of so-called "luxury apartments." Common pleas further found that the vacancy rate of the building was singularly higher than that experienced by other apartment complexes in the Philadelphia area. However, common pleas found that this was mandated by "management policies and decisions to maintain a certain clientele profile" that have resulted in a higher rent structure. (Findings of fact Nos. 12 and 13). Therefore, common pleas concluded that "decreasing rental charges would increase occupancy." (Finding of fact No. 20). While substantial evidence exists for this conclusion, common pleas' analysis did not take into consideration the decreased revenues that would result from lowering the rents on those apartments presently

occupied, nor what effect a change in tenant base would have on the price of future rentals.

Accordingly, we find that there was a lack of substantial evidence upon which common pleas could rely in its primary use of the "sales approach," in conjunction with the "capitalization approach," as the most correct methodology for determining Cedarbrook's true market value. In light of the foregoing, therefore, we would remand the matter of Cedarbrook's assessment to common pleas for re-evaluation of assessment methodology and for allocating greater weight to the capitalization approach in arriving at a more realistic assessment figure.

We next address Cedarbrook's attempt to justify offsetting its income by deducting the operating expenses of the country club and golf club as being necessary amenities offered to each Cedarbrook resident and a critical part of Cedarbrook's ambience. The record indicates, however, that less than half of Cedarbrook's residents have a country club membership and an even smaller percentage have golf club privileges (both of which require separate memberships). Moreover, the Board, in the past, never considered the country and golf clubs integral adjuncts of Cedarbrook but, rather, treated them as separate tax parcels for assessment purposes, which Cedarbrook never, in fact, appealed. In this respect, therefore, common pleas did not err in accepting appellees' analogy between Cedarbrook's situation and that found in *Meadowbrook Properties, Inc. v. Board of Assessment Appeals of Montgomery County*, 36 Pa.Commonwealth Ct. 425, 388 A.2d 1110 (1978), in which the Court determined that excluding a golf course expenditure from apartment complex expenses was appropriate because the golf course was "adjacent" to the apartments and assessed separately from them. Accordingly, we affirm common pleas' determination on this issue.

Turning now to the issue of whether common pleas erred in applying incorrect assessment ratios to Cedarbrook's market value to calculate its assessed value for tax purposes, we must agree with Cedarbrook's argument. The procedure for deter-

mining the assessment ratio to apply to the subject property's market value in order to determine a property's assessed value is set forth in Section 518.2(b) of The General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended*, added by Section 6 of the Act of December 13, 1982, P.L. 1160, 72 P.S. § 5020–518.2(b), which provides:

> The court, after determining the market value of the property pursuant to subsection (a)(1), shall then apply the established predetermined ratio to such value unless the corresponding common level ratio determined pursuant to subsection (a)(2) varies by more than fifteen per centum (15%) from the established predetermined ratio, in which case the court shall apply the respective common level ratio to the corresponding market value of the property.

The common level ratio is defined as the ratio of assessed value to current market value used generally in the county as last determined by the STEB. The established predetermined ratio is defined as the ratio of assessed value to market value as established by the Board of County Commissioners and uniformly applied in determining the assessed value in any year.

■ It is appellant's contention that common pleas, by failing to use the most recent STEB ratios available for calculating assessed value, subjected Cedarbrook to an additional tax liability of $433,421.00 over the 9–year period in question, rather than a $927,784.00 refund, to which it would have been entitled had the most recent STEB ratios been used. Appellant further argues that common pleas erroneously failed to accept the expert testimony of its statistician, Dr. Linnemann, in establishing that not using the most recent STEB ratios violated appellant taxpayer's constitutional rights to uniformity and equal protection.

In considering this issue, we review the calculation methodology set forth in *Walnut–Twelve Associates v. Board of Revision of Taxes of the City of Philadelphia*, 131 Pa.Commonwealth Ct. 404, 414–415, 570 A.2d 619, 624, *petition for allowance of appeal denied*, 525 Pa. 652, 581 A.2d 577 (1990), where the Court clearly stated:

Section 518.2(b) of the Assessment Law, 72 P.S. § 5020–518.2(b), sets forth the procedure for determining the assessment ratio to be applied to the property's market value to arrive at the property's assessed value.

.    .    .    .    .

The common level ratio is defined as the ratio of assessed value to current market value used generally in the county as last determined by the STEB. *Croasdale v. Dauphin County Board of Assessment Appeals,* 89 Pa.Commonwealth Ct. 409, 492 A.2d 793 (1985). The established predetermined ratio is defined as the ratio of assessed value to market value as established by the Board of County Commissioners and uniformly applied in determining the assessed value in any year. Section 102 of the Assessment Law, 72 P.S. § 5020–102.

The trial court in *Walnut–Twelve* applied the same STEB, unchanged and in effect since 1983 (since it had not changed), found that the established, predetermined ratio did not vary by more than 15% from the STEB ratio and, therefore, applied the established predetermined ratio to the property's market value, a decision which the Board argues was within the trial court's discretion to make. This Court disagreed and remanded the case back to the trial court to recalculate the disputed assessed values using the most recent STEB ratios, in accord with the rationale of *In re: Appeal of Jostens, Inc.,* 97 Pa.Commonwealth Ct. 106, 508 A.2d 1319 (1986), *petition for allowance of appeal granted,* 514 Pa. 650, 524 A.2d 496 (1987). The *Jostens* decision held that a trial court is statutorily bound to use the most recent STEB ratio available at the time an assessment is appealed, as the State Tax Equalization Board is required by law to establish annually, prior to July 1st, a common level ratio for the previous calendar year. In *Walnut–Twelve,* the trial court's decision was not rendered until January 30, 1989 and, therefore, we found the trial court was *required* to apply the STEB ratios published for the years 1985, 1986 and 1987 and rejected the notion that the trial court had discretion to determine whether to use the STEB ratios for the years in question.

The foregoing *Walnut–Twelve* rationale is analogous to the present case, in that common pleas' decision as to Cedarbrook's assessments for the years 1982 through 1990 was not rendered until August 14, 1990, and the ratios "last determined" by STEB for each of the foregoing years were available. Appellant's brief presents the following comparison of STEB figures used by common pleas, each of which was the STEB ratio last determined *before each of the disputed tax years,* to the most recent STEB figures for the disputed tax years, *as available at the time common pleas performed its calculations, August 14, 1990.*

| TAX YEAR | FMV PER J. LOWE | STEB PER J. LOWE | MOST RE-CENT STEB | TAX DUE REFUND | MOST RE-CENT |
|---|---|---|---|---|---|
| 1982 | $29,000,000 | 11.8% | 11.4% | $ 2,345 | $ 20,326 |
| 1983 | $29,925,000 | 11.6% | 10.7% | $ 12,747 | $ 43,470 |
| 1984 | $32,925,000 | 11.4% | 10.1% | $ 64,890 | $ 35,210 |
| 1985 | $35,150,000 | 10.7% | 9.19% | $ 85,716 | $ 51,040 |
| 1986 | $39,325,000 | 10.1% | 8.1% | $142,787 | $ 58,040 |
| 1987 | $43,225,000 | 9.19% | 6.99% | $141,251 | $115,347 |
| 1988 | $47,625,000 | 8.19% | 5.8% | $113,600 | $194,318 |
| 1989 | $49,400,000 | 6.9% | 5.3% | $ 425 | $240,593 |
| 1990 | $51,965,000 | 5.8% | 5.3% | $129,490 | $214,440 |
| | | | **TOTAL:** | **$433,421** | **$927,784** |

Accordingly, based on the foregoing discussion, common pleas' decision is affirmed with respect to the issue of excluding country and golf club operating expenses from Cedarbrook's calculation of income, but is remanded to common pleas for: (1) reconsideration of the record, as to substantial evidence regarding assessment methodologies, particularly in light of recent appellate decisions; (2) according greater weight to the income capitalization approach as the most appropriate for determining Cedarbrook's valuation; and (3) recalculation of Cedarbrook's assessed values for the years 1982 through 1990 by applying the most recent STEB ratios in compliance with the rationale set forth in *Walnut–Twelve* and *Jostens.*

This matter was argued before a panel consisting of Judge COLINS, Judge KELLEY and Senior Judge BARBIERI. Because of the conclusion of Senior Judge BARBIERI's service, the case was submitted on briefs to Senior Judge LEDERER for his consideration as a member of the panel.

## ORDER

AND NOW, this 2nd day of June, 1992, the order of the Court of Common Pleas of Montgomery County in the above-captioned matter is affirmed insofar as it relates to excluding the country club and golf club expenses from a calculation of Cedarbrook's income. The order is vacated and remanded to recalculate the property's assessed value for the years in question based upon a methodology and State Tax Equalization Board ratios consistent with the foregoing opinion.

Jurisdiction relinquished.