IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Appeal of IS3 West Girard LLC :
 :
From a Decision of: Board of Revision : No. 705 C.D. 2023
of Taxes : Submitted: June 6, 2024
 :
Appeal of: IS3 West Girard LLC :


BEFORE: HONORABLE CHRISTINE FIZZANO CANNON, Judge
  HONORABLE LORI A. DUMAS, Judge
  HONORABLE STACY WALLACE, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE      FILED: July 15, 2024


  IS3 West Girard LLC (Taxpayer) appeals from the order of the Court of Common Pleas of Philadelphia County (trial court) that established the fair market value of Taxpayer's real property for tax years 2022 and 2023 at $23,200,000. Taxpayer appealed to the trial court from the City of Philadelphia (City) Board of Revision of Taxes' (Philadelphia Tax Board) decision after Taxpayer challenged the City's property tax assessment. After review, we affirm.

## BACKGROUND

  In 2021, Taxpayer purchased approximately one-half of the buildings that comprised the former Hahnemann Hospital complex for $36 million. Reproduced Record (R.R.) at 401A. Taxpayer's purchase included a parking garage located at 306-320 North Broad Street in Philadelphia, Pennsylvania, known as the Wood

Street Garage (Property). *Id.* The Property contains approximately 774 parking spaces and originally served as parking for the Hahnemann Hospital. *Id.* at 405A. The hospital and the Property closed in 2019, and Taxpayer purchased the Property in 2021 and reopened it for parking purposes. *Id.* at 401A-02A.

For tax years 2022 and 2023, the City set the actual market value of the Property at $24,178,100 and $23,168,800, respectively. Taxpayer appealed to the Philadelphia Tax Board, challenging the tax assessment for both tax years as excessive. The Philadelphia Tax Board modified the assessments. Taxpayer then appealed to the trial court.

On April 28, 2023, the trial court held a *de novo* hearing. At the hearing, the City presented the certified market value assessments for the 2022 and 2023 tax years. *Id.* at 399A.

In response, Taxpayer presented the testimony of Andrew Eisenstein (Eisenstein), a member of Taxpayer. *Id.* at 401A. Eisenstein testified that in July 2021, Taxpayer purchased the Property along with others that comprised the former Hahnemann Hospital complex for $36 million. *Id.* He explained Taxpayer allocated approximately $10 million of the purchase price for the Property. *Id.* Additionally, Eisenstein noted that after the Hahnemann Hospital closed in 2019, the Property closed and did not generate any income. *Id.* at 402A. However, after Taxpayer purchased the Property, it opened the Property for daily and monthly parking. *Id.* Eisenstein provided the daily parking rate to be approximately $22 per day and the monthly rate to range from $145 to $210. *Id.* Eisenstein explained the Property is not profitable and outlined the challenges of running the Property because of the low demand for parking in its location after the closure of the hospital. *Id.*

2

Additionally, Taxpayer presented its real estate appraisal expert, Tripp Lukens (Lukens), who prepared a report on the fair market value of the Property.[1] Lukens testified that in his research, he noticed a downward trend concerning occupancy rates for parking garages over the last several years, specifically following the COVID-19 pandemic with more people staying at home and working from home. *Id.* at 406A. Additionally, he discussed the impact of the closure of the Hahnemann Hospital and the location of the Property, and noted a lack of demand for parking in the area. *Id.* Lukens testified he considered the three standard appraisal methods: (1) the cost approach, (2) the sales approach, and (3) the income capitalization approach. *Id.* at 407A. Lukens relied principally on the income approach, but also developed the sales comparison approach as a check of reasonableness on his income approach. *Id.*

Regarding the income approach, Lukens conducted a discounted cash flow analysis.[2] *Id.* Lukens explained this was more appropriate than a direct capitalization approach[3] because direct capitalization works best when an asset is

---

[1] At the hearing, the City raised a hearsay objection to the admission of Lukens' expert report that he had prepared. R.R. at 410A. While the trial court admitted the expert report into the record, the trial court also stated the expert report was "not evidence. The testimony is the evidence." *Id.* at 416A.

[2] According to Investopedia.com, a discounted cash flow analysis "refers to a valuation method that estimates the value of an investment using its expected future cash flows. [This analysis] attempts to determine the value of an investment today, based on projections of how much money that investment will generate in the future." *See* https://www.investopedia.com/terms/d/dcf.asp#:~:text=Discounted%20cash%20flow%20(DCF) %20refers,will%20generate%20in%20the%20future (last visited July 12, 2024).

[3] According to Investopedia.com, a direct capitalization approach refers to an appraisal method that estimates the value of a property based on the income the property generates; it takes the net operating income (NOI) of the rent collected and divides it by the capitalization rate. https://www.investopedia.com/terms/i/income-approach.asp (last visited July 12, 2024).

stabilized, but the Property was operating well below stabilized conditions because of the impact of the Hahnemann Hospital closure and the COVID-19 pandemic. *Id.* Lukens noted the Property had a negative net operating income in 2022, so if he was to apply the direct capitalization approach, he would yield a negative income, and he did not anticipate the Property would be negative in perpetuity. *Id.* Lukens explained that when assessing a stabilized asset, he would consider the property's historical income, which would heavily influence his analysis. *Id.* However, Lukens did not have the financial data for the years the hospital was operating, and when the hospital closed, there were no financials to use for his analysis. *Id.* at 408A. Therefore, Lukens made projections for the Property's future expenses after reviewing expense accounts of three self-park garages that he believed would have a similar stabilized expense profile.[4] *Id.*

To check his work, Lukens applied the sales comparison approach. *Id.* at 410A. Lukens considered the sales of nearby parking garages, including two post-COVID sales in "excellent" locations, and an amenity parking garage to a nearby hospital, which sold for approximately $16,000 per parking space. *Id.* Lukens adjusted for the impact of COVID-19, which he indicated was a "big adjustment," as well as for the location, size, and access of the garages. *Id.* Lukens determined a price of $13,000 per parking space for the Property, resulting in a value of $10,100,000 for tax year 2022, and due to further erosion of the market and rise in the interest rate environment, a value of $9,700,000 for tax year 2023, based on the sales comparison approach. *Id.* Lukens testified that despite developing the sales

---

[4] Initially, because Lukens lacked a full set of the typical financial information, he used the information available and extrapolated based on economic projections for 2022 and 2023. R.R. at 409A. After he received information that included the Property's 2022 performance, Lukens provided a supplemental report that included more concrete numbers, although the 2023 valuation remained the same based on economic projections for the remainder of that year. *Id.*

comparison approach, he did not place any weight on it because it is not an approach on which buyers and sellers of parking garages would rely. *Id.* Ultimately, Lukens testified that in his opinion, the Property's actual market value for tax year 2022 was $10,400,000 and tax year 2023 was $9,150,000, based on his application of the income approach. *Id.* at 404A.

In response, the City called its expert, Albert Hughes (Hughes). Hughes testified that he did not apply the income approach to assess the Property. *Id.* at 419A. Hughes explained that upon review of the Property's financial information, there were only negative numbers, which were not reliable for developing an income approach to assess the Property. *Id.* Although Hughes acknowledged the income approach would typically be preferable for valuation of a parking garage, Hughes applied the sales comparison approach because of the lack of historical financial data upon which he could rely. *Id.* Hughes explained that when he applies the sales approach, he considers sales of similar properties and applies positive or negative adjustments to those sales to bring them either down or up to where he believes they would be in relation to the subject property. *Id.* at 420A. To do this, he uses an adjustment grid. *Id.* Hughes explained the adjustment grid indicates why a property is either superior or inferior to the subject property and quantifies the difference. *Id.* Hughes expounded that when selecting comparable sales, he uses an approach called a "bookend," meaning he chooses properties he knows to be inferior and superior to the subject property. *Id.* at 421A. This provides a range and enables him to determine where the subject property would fall between two extremes. *Id.*

In assessing the Property, Hughes reviewed all the parking garage sales he could find in Philadelphia but utilized the five he believed to be the most appropriate; those sales occurred between April 2015 and May 2021. *Id.* at 424A. Hughes

5

referred to those parking garages as the Chancellor garage, Cube's garage, the Strawberry Apartment garage, the 304 Race Street garage, and the parking garage at 618 Market. *Id.* at 421A. When comparing those sales to the Property, Hughes factored in various adjustments including differences in location, access to exposure, quality, size, age, condition, and economic characteristics. *Id.* Hughes testified to the percentages of the adjustments he applied and the reasons for applying the adjustments. *Id.* at 420A-22A. Hughes noted that while he had information on the sale of the Property to Taxpayer, he did not use it in his analysis because it was a bulk sale transaction, and he considered the purchase to be a "distressed" sale. *Id.* at 423A. Hughes explained the Property was an empty building, which was purchased along with other empty buildings, and thus, he considered the sale to be distressed. *Id.* Additionally, Hughes noted Taxpayer allocated the purchase price of the Property, and based on these circumstances, he did not find the sale to be a market transaction he could use to support his sales comparison approach. *Id.* Ultimately, based on his application of the sales comparison approach, Hughes determined the value of the Property by applying a price per parking space of $30,000, which he obtained by reviewing the comparables and making the necessary adjustments, and his appraisal resulted in a valuation of $23,200,000 for tax years 2022 and 2023. *Id.* at 419A.

In rebuttal, Taxpayer called Michael Acquaro-Mignogna (Mignona), an expert appraisal reviewer, to testify regarding Hughes' appraisal. *Id.* at 430A. Mignona testified that in his opinion, Hughes' appraisal lacked an adequate analysis of the recent sale of the Property. *Id.* Mignona took issue with Hughes' characterization of the sale of the Property as a distressed sale, which he indicated is defined as a "sale involving a seller acting under undue stress," which the Property

6

purchase was not. *Id.* at 431A. Additionally, Mignona concluded Hughes should have utilized the income approach in his appraisal and found multiple issues with Hughes' use of the sales comparison approach. *Id.* Mignona opined the income approach should be utilized when valuing an income-producing property, even with a lack of financial history. *Id.* Mignona also challenged the comparables the City used in its sales comparison approach because the properties had different property right interests. *Id.* at 432A. Specifically, while the Property was appraised as a fee simple property interest, two others were appraised as lease fee sales and a leasehold sale property interest.[5] *Id.*

After considering the experts' opinions, the trial court accepted Hughes' appraisal and set the value of the Property for tax years 2022 and 2023 at $23,200,000. *Id.* at 447A. The trial court rejected Lukens' appraisal as speculative, finding his reliance on the income approach flawed because his conclusion was based on a small data set of financial information, requiring him to extrapolate negative incomes from the Property in the future. *Id.* at 455A. Because there was no "robust financial picture," the trial court found Lukens' conclusion unreliable. *Id.* Additionally, the trial court rejected Lukens' use of the sales approach to "check" his work because it found Lukens' comparison to be "wholly misplaced and an apples to oranges comparison without any quantifiable upward or downward

---

[5] A "fee simple" refers to a property interest which entitles the owner to exclusive possession of the property. *In re Condemnation Proceeding by South Whitehall Twp. Auth.*, 940 A.2d 624, 628 (Pa. Cmwlth. 2008). A "leased fee" is as "[a]n ownership interest held by a landlord with the rights of use and occupancy transferred by the lease to others." *Tech One Assocs. v. Bd. of Prop. Assessment, Appeals & Rev. of Allegheny Cnty.*, 53 A.3d 685, 689 (Pa. 2012) (quoting American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 83 (12th ed. 2001)). A "leasehold" interest is "[t]he interest held by the lessee (the tenant or renter) through a lease transferring the rights of use and occupancy for a stated term under certain conditions." *Id.* (quoting *The Dictionary of Real Estate Appraisal,* 162 (4th ed. 2002)).

7

adjustments." *Id.* at 456A. The trial court noted the parking garage Lukens used as a comparable was in a completely different area of the City and used exclusively as an amenity to an adjoining hospital. *Id.* By comparison, the Property is independent of the former Hahnemann Hospital and has uses beyond hospital parking. *Id.* Recognizing no two properties are identical, the trial court noted an appraiser must apply adjustments, and the trial court found Lukens did not testify credibly regarding adjustments and did not adequately explain how or why he quantified adjustments downward or upward, thereby rendering his income approach appraisal unhelpful to the trial court. *Id.*

In contrast, the trial court found Hughes' appraisal to be clear, concise, and credible as to why the sales comparison approach was preferable in this case. *Id.* at 456A. The trial court noted Hughes used five comparable sales for his appraisal, and then itemized the various downward or upward adjustments applicable to each sale based on location, access, size, building quality, age, condition, and economic characteristics different from the Property. *Id.* Finding Hughes provided the most credible, definitive, and well-reasoned testimony, the trial court accepted Hughes' appraisal and concluded the value of the Property for tax years 2022 and 2023 was $23,200,000. *Id.* at 457A. Taxpayer now appeals to this Court.

On appeal, Taxpayer argues the trial court erred by relying on the sales comparison approach to value the Property because it was an income-producing property and, therefore, the trial court should have relied on the income approach. Taxpayer's Br. at 3. Additionally, Taxpayer asserts the trial court erred because its reliance on the sales approach in setting the Property's value was not supported by substantial evidence in the record. *Id.* Finally, Taxpayer contends the trial court erred by relying on expert reports that it refused to admit into evidence. *Id.* In

8

response, the City asserts the trial court did not err as the law does not require an appraiser to develop a certain valuation approach dependent on the type of property being appraised, and the trial court acted within its discretion when it found the City's appraiser credible and rejected testimony from Taxpayer's expert. City's Br. at 7. In addition, the City insists Taxpayer's argument regarding admission of the expert reports lacks merit because the trial court considered the reports, despite indicating that they were not evidence after admitting them into the record at the hearing. *Id.* at 33-34.

## DISCUSSION

In tax assessment cases, the trial court hears the matter *de novo* and is the ultimate finder of fact. *Grand Prix Harrisburg, LLC v. Dauphin Cnty. Bd. of Assessment Appeals*, 14 A.3d 193, 200 (Pa. Cmwlth. 2011). On appeal, we review to determine whether the trial court abused its discretion, committed an error of law, or reached a decision not supported by substantial evidence. *Herzog v. McKean Cnty. Bd. of Assessment Appeals,* 14 A.3d 193, 199 n.15 (Pa. Cmwlth. 2011). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Kennett Consol. Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 228 A.3d 29, 34 (Pa. Cmwlth. 2020). The trial court is the finder of fact; its findings are entitled to great deference and "will be reversed only for clear error." *Parkview Ct. Assocs. v. Delaware Cnty. Bd. of Assessment Appeals*, 959 A.2d 515, 519 n.8 (Pa. Cmwlth. 2008). Thus, so long as the trial court's findings are supported by substantial evidence in the record, we will not disturb those findings on appeal. *Herzog*, 14 A.3d at 200.

The procedure for a tax assessment appeal before the trial court is well settled. *Green v. Schuylkill Cnty. Bd. of Assessment Appeals*, 772 A.2d 419, 425-26 (Pa.

9

2001). First, the taxing authority must present its assessment record into evidence. *Id.* The assessment record is sufficient evidence of a *prima facie* case for the validity of the assessment. *Id.* The burden then shifts to the taxpayer to provide credible, relevant evidence to refute the assessment record. *Id.* Where the taxpayer produces sufficient proof to overcome its initial status, the *prima facie* significance of the taxing authority's assessment figure has served its procedural purpose, and it loses the weight previously accorded. *Id.* The taxing authority then has the right to rebut the taxpayer's evidence, and in such a case, the weight to be given to the evidence is for the trial court to determine. *Id.*

Section 402(a) of the General County Assessment Law (Assessment Law)[6] requires the City to assess taxable property periodically to determine its "actual value." A property's "actual value" is the property's fair market value, which is defined as "the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." *Harley-Davidson Motor Co. v. Springettsbury Twp.*, 124 A.3d 270, 279 (Pa. 2015). The "actual or fair market value, while not easily ascertained, is fixed by the opinions of competent witnesses as to what the property is worth on the market at a fair sale." *Id.* When determining a fair market value, the property tax assessment "must include all relevant factors having a bearing on that value." *Id.* at 283. Further, the property must be valued based upon its current use, even if an appraiser opines that the highest and best use of the property is different. *Id.* at 280-81.

The Assessment Law authorizes three approaches to valuation of a property: (1) the cost approach, (2) the sales comparison approach, and (3) the income

---

[6] Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020-402(a).

approach. 72 P.S. § 5020-402(a). First, the cost approach "considers reproduction or replacement costs of the property, less depreciation and obsolescence." *Aetna Life Ins. Co. v. Montgomery Cnty. Bd. of Assessment Appeals*, 111 A.3d 267, 278 (Pa. Cmwlth. 2015) (citation omitted). Second, the sales comparison approach "compares the subject property to other similar properties which have been sold, giving consideration to the size, age, physical condition, location, neighborhood, extra amenities, date of sale, lot size, style of building, unique features, and type of financing." *Parkview Ct.*, 959 A.2d at 517 (citation omitted). Under the sales comparison approach, Section 402(a) of the Assessment Law permits expert testimony as to "comparables" in order to establish market value. 72 P.S. § 5020-402(a); *Aetna Life Ins.*, 111 A.3d at 279. The term "comparables" refers to

> properties of a similar nature which have been recently sold. In order to be comparable . . . however, the properties need not be identical. In reviewing sales of other properties, 'to compare' means to examine the characters or qualities of one or more properties for the purpose of discovering their resemblances or differences. The aim is to show relative values by bringing out characteristic qualities, whether similar or divergent. Thus, comparisons based on sales may be made according to location, age and condition of improvements, income and expense, use, size, type of construction and in numerous other ways.

*Aetna Life Ins.*, 111 A.3d at 279. Lastly, the income approach "is used to appraise income producing real estate by dividing the annual net rental income (gross income minus expenses) expected from a property by the investment rate of return (the capitalization or 'cap' rate) for that property." *Cedarbrook Realty, Inc. v. Cheltenham Twp.*, 611 A.2d 335, 339 n.4 (Pa. Cmwlth. 1992). "The income approach assumes that an investor would set a price for a property based on a projected income stream that would produce an acceptable return on the capital invested in its purchase." *In re PP&L, Inc.*, 838 A.2d 1, 9 (Pa. Cmwlth. 2003)

11

(citation omitted). The income is capitalized to determine its present value by using an appropriate discount rate. *Id.* The income approach is often used to appraise income-producing property. *Cedarbrook,* 611 A.2d at 339 n.4.

While the Assessment Law requires consideration of these three valuation methods in conjunction with one another, ultimately, it is up to the trial court to determine which valuation method is most appropriate for a given property. *Aetna Life Ins.*, 111 A.3d at 278. Despite considering the valuation methods, the trial court does not assume the role of assessor or appraiser to independently value a property. *Id.* at 279 (citation omitted). Rather, the trial court's role is to weigh the conflicting testimony and values offered by competing experts and arrive at a valuation based on the credibility of their opinions. *Id.* Notably, the valuation of property is not an exact science, and the trial court is tasked with determining the weight to be accorded to an expert's testimony in this area. *Cedarbrook*, 611 A.2d at 340. As such, the trial court maintains exclusive province over all matters of credibility and evidentiary weight. *RAS Dev. Corp. v. Fayette Cnty. Bd. of Assessment Appeals,* 704 A.2d 1130, 1137 (Pa. Cmwlth. 1997). As the Pennsylvania Supreme Court has indicated, "the only constraint upon the trial court's determination of a fair market value is that it must be supported by expert testimony found to be credible." *Green*, 772 A.2d at 424-25 (citation and emphasis omitted). Therefore, a trial court has discretion to reject any of the three valuation methods if it concludes the method is inapplicable or of little probative value. *RAS Dev. Corp.*, 704 A.2d at 1134-35.

With these general considerations in mind, we turn to Taxpayer's first two arguments. Taxpayer argues the trial court erred by relying exclusively on the sales comparison approach when Pennsylvania law requires consideration of all three valuation methods in conjunction with one another. Taxpayer's Br. at 14.

Alternatively, Taxpayer asserts that even if it was appropriate to use only one approach based upon this record, the trial court should have applied the income approach because the Property is income-producing real estate. *Id.* at 15. Additionally, Taxpayer asserts the trial court erred because its reliance on the sales approach was not supported by substantial evidence. *Id.* at 18. Because these issues are intertwined, we address them together.

In its brief, Taxpayer relies upon the cases of *Cedarbrook*, 611 A.2d at 342, and *Appeal of Marple Springfield Center*, 607 A.2d 708 (Pa. 1992), to support its argument that the trial court was required to accept the income approach to determine the Property's value. Taxpayer's Br. at 2-5. In *Cedarbrook*, this Court determined the trial court erred when it applied the sales comparison approach to value Cedarbrook, a unique luxury apartment complex with a higher-than-normal vacancy rate, against the sales of 12 apartment complexes that were sold for conversion to condominiums and subsequent resale to individual owners. *Cedarbrook*, 611 A.2d at 342. We concluded that using the sales comparison approach in this way ignored the economic realities of the real estate market and was not a true comparable in assessing the market value of a complex being used for continued rental operations. *Id*. Thus, this Court remanded the matter to the trial court so it could, *inter alia*, accord greater weight to the income approach as the most appropriate for determining Cedarbrook's valuation. *Id.* at 345.

In *Marple*, 607 A.2d at 708-09, a taxpayer owned land on which a shopping center was built, and disputed its assessment based on long-term contractual rent restrictions with its key tenant, which set rent at less than current market value. The taxpayer's predecessor had entered into a lease with its primary tenant under which the tenant had options to renew the lease at a constant fixed low rent until the year

13

2044. *Id.* The Pennsylvania Supreme Court held that tax assessors of any property should consider legally binding rent restrictions. *Id.* The Court reasoned:

> Under the assessment statute, . . . there is no meaningful distinction between income restrictions based on applicable federal regulations, and income restrictions based on bona fide contractual obligations . . . . In both instances, the fair market value- the "actual value" or taxable value- is deflated because a buyer cannot anticipate income at current market levels. . . . [W]e see no justification for ignoring [the long-term lease] and [its] conclusive effect on the true market value of the shopping center.

*Id.* at 709. The Court noted that to interpret the tax assessment statute as requiring valuation of a property in a hypothetical "unencumbered form" is to ignore the economic realities of commercial real estate transactions. *Id.* The Court held the income approach was the "most appropriate if not the only valid means of establishing fair market value of real estate when the rental income is below what would otherwise be the current market level but for a long-term commercial lease." *Id.* at 710. Such long-term leases are an accepted aspect of commercial real estate transactions, and their effects have a decisive impact on the price a buyer would pay for an affected property. *Id.*

Here, contrary to Taxpayer's arguments, neither the *Cedarbrook* nor *Marple* holdings required the trial court to accept and apply the income approach in valuing the Property simply because it is an income-producing property. While the facts of those cases warranted application of the income approach, neither case stands for the proposition that a trial court *must* accept and apply the income approach when conducting valuation of an income-producing property. *See In re PP&L, Inc.*, 838 A.2d 1, 9-11 (Pa. Cmwlth. 2003). While Taxpayer correctly asserts the trial court was required to *consider* all three valuation approaches under the Assessment Law,

14

it certainly was not required to *accept* a particular method.[7]  Rather, as in all tax assessment appeal cases, the trial court had discretion to determine which of the valuation methods was the most appropriate and applicable to the Property, so long as its decision was based upon the competent, credible, and relevant evidence presented by the parties.  *See Aetna Life Ins.*, 111 A.3d at 278.

Here, consistent with the Assessment Law, the trial court considered the valuation methods presented by the experts,[8] but ultimately chose to accept the sales comparison approach relied upon by Hughes. The trial court acknowledged the Property was "undoubtedly a challenging appraisal due to the closure of the hospital."  R.R. at 454A.  However, the trial court properly noted that "even a

---

[7] Insofar as Taxpayer argues the trial court erred by violating Pennsylvania Rule of Evidence 702(c) by accepting Hughes' sales comparison approach, we reject this argument.  Pennsylvania Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.  First, at the hearing, Taxpayer stipulated that Hughes was an expert, and Taxpayer failed to raise any objection related to Pennsylvania Rule of Evidence 702(c).  R.R. at 418A. Accordingly, Taxpayer waived any such argument.  Moreover, even if Taxpayer had preserved this issue, the Assessment Law is clear that the sales comparison approach is an appropriate valuation method in tax assessment appeal cases, and Taxpayer fails to offer persuasive legal support for its assertion that such approach is not "generally accepted in the relevant field." *See* Pa.R.E. 702(c).  Accordingly, Taxpayer's argument in this regard lacks merit.

[8] The experts agreed the cost approach was not an appropriate valuation method for the Property. *See* R.R. at 407A, 419A.

challenging appraisal must be soundly rooted in data and reliable methodology." *Id.* The trial court rejected Lukens' opinion and found "the testimony and report of [Hughes] to be much more credible than the testimony and report of [Lukens]." *Id.* The trial court adequately explained its reasons for doing so as follows. The trial court found Lukens' reliance on the income approach to be seriously flawed. The trial court noted that because of the small amount of data, Lukens had to extrapolate negative incomes for the future, which was speculative. *Id.* at 455A. The trial court concluded that in this case, the lack of a robust financial picture rendered Lukens' conclusion unreliable. *Id.* While Lukens used the sales comparison approach as a "check" on his work, the trial court did not find this process reliable either. *Id.* The trial court found Lukens' focus on the sale of the hospital parking garage as a comparable to be "wholly misplaced and an apples to oranges comparison without any quantifiable upward or downward adjustments." *Id.* at 456A. The trial court noted Lukens was unable to testify how he quantified his adjustments upward and downward, which was unhelpful to the trial court. *Id.* The trial court's reasons for rejecting Lukens' testimony are supported by the record.

Conversely, the trial court found Hughes "provided clear, concise and credible testimony as to why the sales comparison approach was preferable in this case." *Id.* Specifically, he used five comparable sales for his appraisal and itemized the various downward or upward adjustments applicable to each sale for location, access, size, building quality, building age, building condition, and economic characteristics that differed from the Property. *Id.* The trial court's reasons for accepting Hughes' testimony are supported by the record.

Additionally, Taxpayer contends the trial court failed to consider the impact of the Hahnemann Hospital closure and the COVID-19 pandemic on the value of the

16

Property. Taxpayer's Br. at 25. We disagree. While the record demonstrates the Property faces pressing demographic and economic difficulties due to its location, the closure of the hospital, and the COVID-19 pandemic, the trial court adequately considered these factors in setting its valuation. The trial court noted:

> There is no question the [Property] was an amenity to now-shuttered Hahnemann Hospital. But the [Property] is also close to several apartment buildings and new developments on North Broad Street. In addition, the Covid-19 pandemic obviously played an impact on the income the [Property] has generated over the last few years. But the economic projections and the [Property's] own 2022 performance suggest that the [Property's] income generation is pointed in a positive direction.

R.R. at 454A. Further, we cannot agree with Taxpayer's argument that the trial court erred by failing to consider the recent sale of the Property. *See* Taxpayer's Br. at 26-29. The trial court considered and rejected the notion that the $10 million purchase price of the Property provided any significant guidance on its valuation because Taxpayer purchased the Property as part of a bundle and there was a lack of evidence to demonstrate how or why Taxpayer allocated $10 million as the price of the Property. R.R. at 454A.

We are mindful that our review in a tax assessment appeal is narrow, and the trial court's findings are entitled to great deference so long as they are supported by substantial evidence. *In re PP&L, Inc.*, 838 A.2d at 10. Here, the trial court found Hughes to be the most credible witness as to valuation. While Taxpayer challenges Hughes' valuation method and raises issues of credibility, the trial court resolved such issues in favor of the City's expert, and we decline to disturb the trial court's credibility determinations. Additionally, Hughes' testimony is evidence upon which the trial court could determine his sales comparison approach was the most probative valuation method for the Property. The trial court has provided a meaningful

17

analysis of the evidence, and consequently, we discern no clear error in its reliance on Hughes' appraisal and application of the sales approach to its valuation of the Property.

Next, we turn to Taxpayer's argument that the trial court erred by failing to admit the expert reports into the record. Taxpayer's Br. at 29. First, Taxpayer contends the trial court's failure to admit the expert reports was "an error of law." *Id.* It then argues the trial court's reliance on the expert reports is "an abuse of discretion[.]" *Id.* at 30. In response, the City maintains that Taxpayer's argument lacks merit because Taxpayer already has what it wanted, which was consideration of the expert reports as part of the record. City's Br. at 34. We agree with the City.

The law is well established that "[a] trial court is vested with wide discretion in deciding whether to allow the admission of expert testimony into evidence and is not subject to reversal absent a clear abuse of discretion." *Condemnation by Pa. Tpk. Comm'n v. Lands of Tarlini*, 185 A.3d 1177, 1182 (Pa. Cmwlth. 2018) (citation omitted). An out-of-court statement constitutes hearsay if it is offered for the purpose of proving the truth of the matter contained in the statement. *Semieraro v. Com. Util. Equip. Corp.*, 544 A.2d 46 (Pa. 1988). However, an expert is permitted to rely on hearsay statements in reaching an opinion. *Condemnation by Pa. Tpk. Comm'n*, 185 A.3d at 1187. Under Pennsylvania Rule of Evidence 703,

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703.

Here, the City made a hearsay objection to the admission of Lukens' expert report into the record. R.R. at 410A-11A. At the conclusion of Lukens' testimony, the trial court responded: "The expert report is in the record. It is not evidence. The testimony is the evidence." *Id.* at 416A. While the trial court attempted to qualify the admission by stating the report was not "evidence," ultimately, the trial court admitted the expert report into the record. It is well established that a report prepared by an expert who is not called to testify as a witness is hearsay, *see Semieraro*, 544 A.2d at 47 (citation omitted), but here, Lukens testified and was subject to cross-examination. As such, we cannot conclude the trial court abused its discretion by admitting Lukens' expert report or subsequently considering the expert report in reaching its decision. Moreover, even if the trial court had erred by admitting the expert report, we would conclude such error was harmless because substantial evidence exists in the testimony alone to support the trial court's findings.

## CONCLUSION

The trial court did not abuse its discretion, commit an error of law, or render a decision unsupported by the evidence in setting the actual value of Taxpayer's Property. Accordingly, we affirm.

_____
STACY WALLACE, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Appeal of IS3 West Girard LLC    :
                                          :
From a Decision of: Board of Revision   :   No. 705 C.D. 2023
of Taxes                                      :
                                          :
Appeal of: IS3 West Girard LLC       :

## **O R D E R**

**AND NOW**, this 15th day of July 2024, the Court of Common Pleas of Philadelphia County's order dated May 17, 2023, is **AFFIRMED**.

_____
STACY WALLACE, Judge